R. KEVIN CUMMINGS *et al.*, Plaintiffs-Appellees, v. GAUTAM JHA, Defendant-Appellant (S. Lakshmanan, Defendant).

Fifth District   No. 5—08—0182

Opinion filed September 25, 2009.

Scott L. Howie, of Pretzel & Stouffer, Chtrd., of Chicago, for appellant.

Morris Lane Harvey, of Law Offices of Morris Lane Harvey, of Mt. Vernon, for appellees.

PRESIDING JUSTICE WEXSTTEN delivered the opinion of the court:

The defendant, S. Lakshmanan, M.D., performed laparoscopic surgery on the plaintiff, R. Kevin Cummings, to remove Kevin's gallbladder. Kevin suffered a common postoperative complication, a bile leak, that went undiagnosed by Dr. Lakshmanan and the defendant-appellant, Gautam Jha, M.D. Kevin, along with his wife, Pamela R. Cummings, filed a medical negligence action against Dr. Lakshmanan and Dr. Jha in the circuit court of Marion County, claiming their postoperative care of Kevin fell below accepted standards of care because they failed to discover and treat the bile leak. After hearing the evidence at a trial, the jury returned a verdict in favor of the plaintiffs and awarded damages of $210,000, and the circuit court entered a judgment on the jury's verdict. Dr. Lakshmanan subsequently reached a settlement with the plaintiffs for a payment of $92,500. Dr. Jha moved for a judgment notwithstanding the verdict or a new trial, and the circuit court denied his motion.

Dr. Jha appeals, arguing that he was entitled to a judgment notwithstanding the verdict because the plaintiffs failed to identify a breach of the standard of care that proximately caused the plaintiffs' alleged damages. Dr. Jha also argues that he was entitled to a new trial because the jury's verdict was against the manifest weight of the evidence, because the circuit court abused its discretion in barring an expert witness from clarifying his testimony, because the circuit court abused its discretion when it instructed the jury that it could award damages for the sick days Kevin had used, and because the circuit court abused its discretion when it allowed the plaintiffs' counsel to engage in repressive questioning tactics. We affirm.

## BACKGROUND

On August 20, 1999, Kevin underwent laparoscopic surgery for the removal of his gallbladder. On the second day after the surgery, Kevin suffered pain similar to that experienced before the surgery, and on August 30, 1999, Kevin returned to Dr. Lakshmanan for a scheduled follow-up appointment and complained about the pain. Dr. Lakshmanan provided Kevin with a prescription for Pepcid or Prevacid for an esophageal spasm.

Kevin's pain continued. Because Dr. Lakshmanan was leaving town, on September 1, 1999, his office referred Kevin to Dr. Jha, who

treated Kevin on September 2, 1999. During Kevin's visit to Dr. Jha's office, he completed a form entitled "Welcome to Our Practice," on which he identified chest pain as his reason for the visit and rated the pain as being sometimes a four on a scale of one to five. Kevin noted on the form that "gall[ ]bladder surg[ery]" was an "[a]ssociated [s]ign[ ]/[s]ymptom." Dr. Jha diagnosed Kevin as having viral pericarditis (inflamation of the pericardium or pericardial sac, which surrounds the heart) and prescribed a nonsteroidal, anti-inflammatory drug called indomethacin. On September 6 or 7, Kevin phoned Dr. Jha's office stating that, although he was still experiencing some pain, the medication was helping to alleviate it. Kevin requested more medicine before he left town for a work-related trip to a lineman's rodeo in Kansas City, Missouri, and Dr. Jha prescribed additional indomethacin, in addition to Darvocet, a pain medication.

On September 10, 1999, Kevin and Pamela traveled to Kansas City for the lineman's rodeo, a competition among electric linemen. After participating in the lineman's rodeo the next day, Kevin woke up during the early morning hours of September 12, 1999, with severe chest pain. Kevin remembered that when he stood up, the pain, which had been centralized in his chest, flooded all over his belly and went "all the way down."

That morning, Kevin was admitted to the North Kansas City Hospital in Kansas City, Missouri, with chest and upper abdominal discomfort. Kevin informed Dr. Douglas Bogart, a cardiologist, that he had been diagnosed with pericarditis. After undergoing a clinical examination, an echocardiogram, which was normal, and an electrocardiogram (EKG), which was also normal, Dr. Bogart was not confident that Kevin's pain was due to a cardiac issue such as pericarditis. Dr. Bogart requested gastrointestinal and general surgery consultations.

Dr. Trent L. Failing, a general surgeon, ordered a hepatobiliary scan, whereby a small amount of radioactive tracer was injected into Kevin's bloodstream to identify whether or not bile was successfully moving through the system into the small intestine. The radiologist's interpretation of that hepatobiliary scan indicated that there was a bile leak in the bile duct, and Kevin was referred to gastroenterology. Upon discovering the bile leak, Dr. Failing sought to drain the bile that was accumulating and to drain the biliary tract. Initially, to avoid repeat surgery, Dr. Failing chose an endoscopic retrograde cholangiopancreatography (ERCP) procedure, which involved the passage of a flexible endoscope through the mouth through the upper digestive tract into the upper small intestine. When an ERCP is successfully performed, the anatomy is defined, the bile leak from the liver bed is identified, a stent is placed, the system is decompressed, and percuta-

neous drainage is established so bile does not pool in the abdominal cavity. Dr. Failing testified that in such a case, the bile leak may seal on its own over a period of time to avoid a trip to the operating room.

In attempting a successful ERCP on September 13, 1999, gastroenterologist Dr. James Walden sought to obtain images of Kevin's bile duct system to confirm the presence of a leak and, if confirmed, do a secondary procedure as a part of this procedure to attempt to alleviate the leak. Dr. Walden's goal was "to attempt to pass a catheter[, a thin, hollow tube,] through the endoscope and into the opening in the intestinal wall where the bile duct drains bile from the liver into the intestine [and, in doing so,] attempt to inject x-ray dye into the bile duct system *** to obtain images of the bile duct system to examine the anatomy." As is the case in approximately 5% to 10% of the time, however, Dr. Walden was unable to successfully cannulate or inject dye into that bile duct; he was unable to pass a catheter into the bile duct itself.

After the unsuccessful ERCP attempt, the physicians planned to attempt percutaneous placement of a drain into the abdominal cavity, *i.e.*, placement of a hollow tube through the abdominal wall, to drain any ascites or fluid, which may contain bile, which is a chemical irritant that can be excruciatingly painful, from the abdominal cavity. The radiologist's attempt to establish the percutaneous drainage so that the leak would at least be controlled was also unsuccessful because a target area, a fluid collection, could not be identified to place the drain to decompress the fluid. Because the gastroenterologists were unable to treat the bile leak conservatively, Dr. Failing ultimately had no other way to evaluate the situation except to perform a surgical exploration.

Dr. Failing and Dr. David M. Tripses, also a general surgeon in Kansas City, performed surgery on Kevin on September 14, 1999. Dr. Tripses testified that the resolution of the hepatobiliary scan was not that good, but it indicated that the bile leak was somewhere in the vicinity of where the gallbladder would have been attached to the right lobe of the liver. Dr. Tripses's purpose for the surgery was to visualize the area where the bile leak was. Dr. Failing noted obvious bile staining throughout the abdominal cavity. Dr. Tripses explained that, in the course of the surgery, the loose bile in Kevin's abdomen was removed as best as possible. Accordingly, during the surgery, some of the pooled bile was removed from the abdominal cavity, and a drain was placed to allow the drainage of any accumulated fluid from inside the belly to outside.

Dr. Tripses testified that they placed a drain in the gallbladder fossa, which is where the gallbladder is attached to the liver, as near

as possible to the leak to try to divert the drainage to the outside. Dr. Tripses testified that he last saw Kevin on September 18, 1999, that Kevin's vital signs were stable, that there was some bilious drainage in his drain bolt that had been placed surgically, and that he had improved.

Dr. Gregory Barber, a gastroenterologist from Kansas City, testified that after the surgeons identified the bile leak and placed a drain in the area where there appeared to be a bile collection from the bile duct, they felt that, within a period of time, the drain by itself was not going to be enough for Kevin to successfully recover. Dr. Barber was asked to reattempt the ERCP to attempt an internal bridging of that bile duct leak by placing a stent. This procedure allows spontaneous closure of the bile duct leak. Dr. Barber performed the ERCP and successfully placed the stent, which ultimately had to be removed. Kevin would return to Kansas City six weeks later for Dr. Barber to remove the stent. On September 17, 1999, Kevin felt much better, and there was a very small amount of drainage at that point, indicating that the stent was working.

Dr. Failing testified that, based upon a reasonable degree of medical certainty, considering that Kevin had a bile leak which had been treated with an attempted ERCP, an attempted radiological approach, laparoscopic surgery, and a successful ERCP with a stent placement and removal, Kevin's long-term prognosis was very good. Dr. Failing testified that Kevin should not experience any long-lasting effects, i.e., no damage to the liver or biliary system. Dr. Failing testified that Kevin's short-term prognosis would involve some problems from hospitalization, such as decreased activity, strength, and energy and suffered pain.

Ultimately, Kevin was hospitalized in the intensive care unit at North Kansas City Hospital for seven days. On September 19, 1999, he was discharged from the hospital. On November 1, 1999, he was released to work his normal job, with no physical restrictions. As a result of the Kansas City hospitalization, Kevin used 280 hours of sick time, from the 480 hours he had accumulated as of January 1, 1999. Kevin explained that his employer allowed him to accumulate a maximum of 70 hours of sick time each year, with the maximum amount of accumulation totaling 480 hours. By the time of the trial, he had accumulated enough days to replace the 280 hours he had used in 1999 and had therefore reaccumulated the maximum of 480 hours. Kevin earned a $25.49 hourly wage as a lead lineman in August 1999.

The plaintiffs filed suit, claiming that Dr. Lakshmanan and Dr. Jha were negligent for failing to timely diagnose a bile leak and resulting biloma when examining Kevin after surgery. As to Dr. Jha, Kevin

alleged that he had been negligent in failing to detect the bile leak during the office visit on September 2, 1999. Kevin sought damages for expenses and pain and suffering resulting from the alleged misdiagnosis. Pamela sought damages for the loss of Kevin's society, companionship, consortium, and services.

The trial began on October 19, 2007, and continued into November. At the trial, Pamela testified that after she and Kevin had returned from Kansas City, Kevin was afraid to be by himself. Pamela testified that they were required to return to Kansas City two months after the surgery to remove the stent that had allowed the bile to proceed through Kevin's system. Pamela testified that Kevin was out of work for those two months and was depressed and irritable. Pamela testified that Kevin remained irritable for a year after returning from Kansas City and that his irritability became a hardship for the marriage. Pamela testified that Kevin also suffered from nightmares and flashbacks. Pamela testified that since that time, they had rebuilt the marriage.

Thomas Mehaffey, Ph.D., a retired clinical psychologist, testified that he evaluated Kevin through a clinical interview and psychological testing. Kevin reported that he thought he was dying in Kansas City, that he experienced nightmares and flashbacks following the surgery, and that he was terrified. Dr. Mehaffey testified that the traumatic occurrence of September 12, 1999, in Kansas City caused Kevin post-traumatic stress disorder and associated personality changes.

Kevin testified that although he completed the form at Dr. Jha's office on September 2, 1999, indicating that he experienced chest pain that happened various times of the day, that the pain was associated with his gallbladder surgery, and that the Sunday prior to the appointment was the last time he had experienced a major episode of pain, Dr. Jha did not ask him when he first experienced the chest pain or how the pain felt and Dr. Jha did not question him about his recent gallbladder surgery.

The plaintiffs presented the expert testimony of Dr. James Moss, an advanced laparoscopic surgeon. Dr. Moss testified that in performing the laparoscopic surgery to remove Kevin's gallbladder, the surgeons did not deviate from the appropriate standard of care. Dr. Moss testified, however, that the most significant complication of this surgery is a leak of bile after surgery because bile is very irritating to the lining of the abdominal cavity. Dr. Moss testified that when a doctor examines a patient who has undergone a laparoscopic cholecystectomy and has had abdominal pain recurring within the first week or so of surgery, the number one diagnosis is a bile leak because it is the most common cause of pain.

Dr. Moss reviewed Dr. Jha's records of Kevin's September 2, 1999, visit. Dr. Moss testified that Dr. Jha's diagnosis of pericarditis was incorrect. Dr. Moss testified that there was no indication in Dr. Jha's record that he inquired about the precise nature of Kevin's chest pain, which would be something to note to differentiate between pericarditis and a bile leak.

Dr. Moss explained, "A biloma is a collection of bile that [is] surrounded inside by sort of an envelope." Dr. Moss testified that, to a reasonable degree of medical certainty, a biloma had formed in Kevin, starting with the onset of pain about two days after he had returned home from the laparoscopic cholecystectomy, because there was a bile leak. Dr. Moss testified that a reasonably competent surgeon in Dr. Jha's position would have determined whether or not there was a biloma or bile leak by drawing blood and performing an ultrasound. Dr. Moss testified that if the proper tests had been performed and the biloma had been detected, a relatively simple procedure, "swallowing [a] hose pipe, ERCP with a—what [is] call[ed] a sphincterotomy, would have treated the problem."

Dr. Moss testified that he believed that Kevin's bile leak began on August 22 and lasted through September 12, 1999. Dr. Moss testified that Kevin's sudden onset of severe pain occurring in Kansas City on the morning of September 12, 1999, was consistent with a rupturing of the biloma. Dr. Moss testified, "[T]he biloma burst[,] and the bile just went over his insides." Dr. Moss testified, "The bile, which is very irritating, would have spilled out over the intestines and lining of the abdominal cavity." Dr. Moss testified that if the bile leak had been previously diagnosed, the rupture and pain in Kansas City would have been nonexistent. Dr. Moss testified that the rupture of the biloma complicated Kevin's treatment because the complications and the risks of chemical peritonitis (inflammation of the membrane that lines the abdomen) are greater.

The plaintiffs also presented the expert testimony of Dr. Kenneth Stein, an expert in internal medicine. Dr. Stein testified that it was unreasonable for Dr. Jha to diagnose Kevin with pericarditis based on the information that had been obtained. Dr. Stein testified that Dr. Jha's records indicated that there was no pericardial rub, which is a rub resulting from the irritated heart rubbing against the irritated coating (the pericardium), typically characteristic of a finding of pericarditis, nor were there characteristic EKG findings that one would expect to find with pericarditis. Dr. Stein testified that although Dr. Jha diagnosed Kevin with viral pericarditis, with which one would expect a fever, Dr. Jha's records reported that Kevin did not have a fever. Dr. Stein testified that neither Kevin's pulse nor his heart rate

was suggestive of pericarditis. Dr. Stein testified that a reasonably prudent physician would have ordered various tests, including an echocardiogram or a chest X-ray, to ensure that the patient was not accumulating fluid around the heart and that, without performing those procedures, it was not appropriate to diagnose pericarditis. Specifically, Dr. Stein testified that a reasonably prudent physician would have ordered an echocardiogram either before making a diagnosis of viral pericarditis or to confirm a diagnosis of viral pericarditis. Dr. Stein testified that, based on the information in Dr. Jha's medical record, there was no basis from which a reasonably competent internal medicine physician could have reached the conclusion that Kevin had viral pericarditis.

Dr. Stein testified that, based on the records, Dr. Jha diagnosed pericarditis only on Kevin's assertion that he felt better leaning forward and worse lying down. Dr. Stein testified that a reasonably competent physician could not diagnose pericarditis on this postural symptom alone. Dr. Stein testified that, to a reasonable degree of medical certainty, considering Kevin's continuing complaints of pain on September 6 or 7 and the negative testing for cardiac problems in Kansas City on September 12, Kevin did not have pericarditis.

Dr. Stein testified that the lower part of the chest contains parts of the abdomen, and he indicated that "chest pain" could be coming from the liver and gallbladder, as well as other organs. Dr. Stein testified that a reasonably competent physician would have asked about Kevin's gallbladder surgery and the relationship between his symptoms and the gallbladder surgery. Dr. Stein testified that nothing in Dr. Jha's records suggested that he questioned Kevin about his gallbladder surgery or his biliary system. Dr. Stein testified that, considering the history of gallbladder surgery reported, a reasonably competent physician should have investigated Kevin for a surgical complication. Dr. Stein testified that, within a reasonable degree of medical certainty, Kevin did not have pericarditis when he was examined by Dr. Jha and that Kevin's symptoms were caused by a biloma, a collection or balloonlike structure filled with bile located in the belly.

Dr. Stein testified that the records from the Kansas City surgery revealed that the biloma had ruptured and that there was obvious staining throughout the abdominal cavity. Dr. Stein testified that had the biloma been diagnosed on September 2, 1999, with Dr. Jha, the surgeons would not have been required to deal with the complication of the ruptured biloma. Dr. Stein testified: "Kevin would not have been in Kansas City on the 12th if the situation had been taken care of, [if] it had been diagnosed. The whole hospitalization and the occur-

rences of that hospitalization would not have occurred if the diagnosis had been made on September 2 while he was still here in Salem." When asked whether the procedures performed on Kevin in Kansas City would have been necessary had the biloma been diagnosed on August 30 as opposed to September 12, Dr. Stein testified as follows:

"If there is a biloma, meaning that there's a collection of fluid, and that fluid is still sitting there in a balloon in what we call the right upper quadrant under the ribs, it would be much easier to percutaneously drain it. Meaning, if you stick a needle in it, you can drain all of the fluid out. Plus, depending on what size it was on the 2nd, it may or may not have been large enough that it would have required drainage. We're not sure how large it was on the 2nd. If the drainage was obtained percutaneously, they might have only needed to do one ERCP to place the [stent], another ERCP to remove the [stent]. When he was in Kansas City he needed one ERCP which was first done and not successful in placing the [stent]. Then he needed to have a surgical procedure done since they were not able to percutaneously drain the fluid. So they tried a percutaneous drain, they tried surgery, then they had to do an extra ERCP. So there were[—]there was one additional ERCP, one additional surgery that would not have needed to be done if the fluid had been drained in Salem, if it had to be drained, and there would have been the ERCP in Salem."

Dr. Stein explained that a "percutaneous drain means that you are placing the drain through the skin without doing surgery." Dr. Stein explained that there was not a biloma at the time of Kevin's surgery in Kansas City because the biloma is a balloon and the balloon had already burst, leaving fluid down to the pelvis, as described by the Kansas City surgeon. Dr. Stein testified, "You can't just stick a [stent] in and drain the fluid out of the balloon if the balloon has already burst." Dr. Stein testified that had the biloma been diagnosed prior to its rupture, the physicians could have performed an ERCP and if the ERCP failed for a failure to place the stent, the radiologist could have placed the drain percutaneously, on an outpatient basis. Dr. Stein explained: "[The Kansas City operation was] not just the laparoscopic placement of the drain. It was a laparoscopic surgery to look for where the bile was leaking from to see if they could find it, what could be done, to re[ ]evaluate the anatomy. They also irrigated out the abdomen, and at the end of the procedure, they placed the drain."

Pursuant to an evidence deposition, Dr. Failing testified that had the bile been loose in Kevin's abdomen on September 11 at the lineman's rodeo, he would not have had the ability to spend three hours climbing poles and competing in a lineman's rodeo as he did. Dr. Failing testified an ERCP may fail because the anatomy is difficult

and because the physicians may be unable to either adequately visualize the ampulla or cannulate it, *i.e.*, to place a plastic tube into the bile duct. Dr. Failing agreed that many times the procedure works but that sometimes, unexplainably, it does not work. Dr. Failing testified that the diagnosis of a bile leak would have been treated the same way whether it had been discovered on September 12 or back on August 30.

The defense presented the expert testimony of Dr. William Casperson. Dr. Casperson testified that it is unusual for a bile leak to occur more than 10 days after surgery. Dr. Casperson testified that the typical scenario for a bile leak is that the bile leak and its symptoms begin immediately after the surgery. Dr. Casperson testified that in Kevin's case, he experienced no tenderness in the abdomen, which would be expected in the case of a bile leak. Dr. Casperson testified that severe pain is also indicative of a bile leak. Dr. Casperson testified that an anti-inflammatory medication, such as the one prescribed by Dr. Jha, would possibly help to alleviate the pain of a biloma but would not completely relieve the pain.

Dr. Casperson testified that in Kevin's case, after the physicians in Kansas City unsuccessfully attempted an ERCP, their attempt at a percutaneous drainage (by way of the skin) to drain the bile leak was also unsuccessful because an ultrasound had revealed no target, *i.e.*, an area where the fluid to be drained had accumulated. Dr. Casperson testified that, aside from the fact that the first ERCP was not successful and, therefore, they had to go for a drainage and had to skip the percutaneous step, Kevin's procedures were the same as they would be for anyone who had a bile leak.

Dr. Casperson testified, in response to a question from the plaintiffs' counsel, that the postural symptom alone was not sufficient to diagnose pericarditis. Dr. Jha's counsel posed the question that, even if it was insufficient, did Dr. Casperson believe that Dr. Jha had breached the standard of care in failing to diagnose a biloma or bile leak? When the plaintiffs' counsel objected, the circuit court sustained the objection and barred Dr. Casperson from responding. In doing so, the circuit court held that Dr. Jha's disclosure-of-witnesses document did not include any Rule 213 (210 Ill. 2d R. 213) disclosures regarding Dr. Casperson and that the question was beyond the scope of the plaintiffs' rebuttal direct examination.

The defense also presented the testimony of Dr. William Daniel Barnhart, a physician who specialized in internal medicine and geriatrics. Dr. Barnhart testified that pericarditis is a clinical diagnosis, which includes taking the initial history and physical and beginning laboratory tests to make a clinical impression. Dr. Barnhart testified

that the history is very important in a clinical diagnosis and that the standard of care would require the physician to have a thorough understanding of the patient's history.

Dr. Barnhart testified that Dr. Jha could not have performed a test on September 2, 1999, that would have positively confirmed pericarditis. Dr. Barnhart testified that an EKG can be normal for a patient to be diagnosed with pericarditis, an echocardiogram would not show the presence of pericarditis, and not all patients with pericarditis have a pericardial rub. Dr. Barnhart testified that Dr. Jha's basis for the diagnosis for pericarditis was reasonable because it was a clinical diagnosis based on the fact that Kevin's chest pain was relieved when he leaned forward, which is a very specific symptom for pericarditis, and on Kevin's response to the medication that was given. Dr. Barnhart testified that it was not a deviation from the standard of care when Dr. Jha diagnosed pericarditis based on Kevin's presentation on September 2, 1999.

Dr. Barnhart testified that Dr. Jha also did not deviate from the standard of care when he failed to order diagnostic testing to look for a bile leak or a biloma on September 2 because there was no abdominal pain, only chest pain. Dr. Barnhart testified that the most common presenting symptom for a patient with a bile leak was abdominal pain.

Dr. Gautam Jha testified that he spent approximately 20 to 25 minutes with Kevin on September 2, 1999. Dr. Jha testified that on that day, Kevin told him that he experienced chest pain that was relieved when he leaned forward. Dr. Jha testified that Kevin did not state that he experienced abdominal pain. Dr. Jha testified that his physical examination of Kevin's abdomen revealed no abnormality, no abdominal pain, and no tenderness. Dr. Jha testified that after Kevin underwent EKG testing, which was normal, he arrived at a diagnosis of acute viral pericarditis. Dr. Jha testified that he reached this diagnosis based on Kevin's statements that when he leaned forward, the pain was better and on the fact that there was no abdominal pain or tenderness.

Dr. Jha acknowledged that 90% of the patients who have pericarditis have a characteristic EKG finding and that Kevin's EKG was normal. Dr. Jha acknowledged that he did not perform an echocardiogram on Kevin. Dr. Jha also acknowledged that he did not perform a blood test, called ESR, which shows elevated positives in most patients with pericarditis. Dr. Jha testified that ESR is nonspecific, an insignificant marker that could show elevated levels for many different reasons and would not confirm a diagnosis of pericarditis.

Kevin's hospital bills were admitted and totaled $48,556.95.

On November 7, 2007, the jury returned a verdict in favor of the plaintiffs and against the defendants. The jury determined that the total amount of damages suffered by Kevin as a proximate result of the medical negligence was $200,000, itemized as follows: $43,000 for necessary medical care expenses, $7,000 for the reasonable value of benefits lost, $100,000 for pain and suffering, and $50,000 for emotional distress experienced. The jury determined that Pamela suffered $10,000 in damages for the reasonable value of the loss of society and companionship with Kevin. On November 16, 2007, the circuit court entered a judgment on the jury's verdicts. In addition to the jury's award of damages, the circuit court held that the plaintiffs incurred recoverable costs in the amount of $2,489.52. Accordingly, the circuit court entered a judgment against Dr. Lakshmanan and Dr. Jha in favor of Kevin for $200,000, in favor of Pamela for $10,000, and in favor of both Kevin and Pamela for $2,489.52.

On January 9, 2008, the plaintiffs filed a satisfaction of judgment that discharged the $210,000 judgment against Dr. Lakshmanan. The record reveals that Dr. Lakshmanan paid $92,500 as settlement funds.

On January 25, 2008, Dr. Jha filed a posttrial motion for a judgment notwithstanding the verdict or, in the alternative, a new trial. Dr. Jha argued that the evidence failed to show that he committed negligence or malpractice or that his act or omission was the proximate cause of Kevin's condition of ill-being. Dr. Jha argued that his care and treatment of Kevin, while it did not include a diagnosis of a bile leak or pursuing the possibility of a bile leak, was within the standard of care given Kevin's presentation. Dr. Jha also argued that the circuit court improperly excluded admissible evidence when it sustained the plaintiffs' objection to the testimony of Dr. Casperson that there had been no breach of the standard of care by Dr. Jha in failing to diagnose a biloma or a bile leak in Kevin. Dr. Jha argued that the circuit court improperly instructed the jury regarding a recovery for ''[t]he reasonable expense of loss of benefits'' because there was no loss of any benefits or earnings.

On March 13, 2008, at the hearing on Dr. Jha's posttrial motion, the plaintiffs argued that the jury's verdict of $43,000, instead of the entire $48,000 of medical expenses, reflected the jury's realization that Kevin would have had to have undergone a procedure even absent the misdiagnosis. After hearing arguments, the circuit court denied Dr. Jha's motion for a judgment notwithstanding the verdict and motion for a new trial. The circuit court reduced the principal amount of the judgment by $92,500, the amount paid by Dr. Lakshmanan. The circuit court therefore entered a modified judgment against Dr. Jha in the principal amount of $117,500. On April 10, 2008, Dr. Jha filed a timely notice of appeal.

## ANALYSIS

### Judgment Notwithstanding the Verdict/New Trial

■ Dr. Jha argues that the circuit court erred in denying his motion for a judgment notwithstanding the verdict because the plaintiffs failed to show that Dr. Jha breached the standard of care or that the alleged breach of the standard of care was the proximate cause of Kevin's injury. Alternatively, Dr. Jha argues that he is entitled to a new trial because the verdict was against the manifest weight of the evidence.

The trial court should enter a judgment notwithstanding the verdict when all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510 (1967). We review *de novo* the denial of a motion for a judgment notwithstanding the verdict. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132 (1999).

"On a motion for a new trial a court will weigh the evidence and set aside the verdict and order a new trial if the verdict is contrary to the manifest weight of the evidence." *Mizowek v. De Franco*, 64 Ill. 2d 303, 310 (1976). To direct a verdict, the court considers a much more conclusive evidentiary situation than is necessary to justify a new trial. *Pedrick*, 37 Ill. 2d at 509-10. "A verdict is said to be against the manifest weight of the evidence where it is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based upon the evidence." *Long v. Friesland*, 178 Ill. App. 3d 42, 54 (1988). "When considering whether a verdict is contrary to the manifest weight of the evidence, a reviewing court must view the evidence in the light most favorable to the appellee ***." *Long*, 178 Ill. App. 3d at 54. "The determination of whether a new trial should be granted rests within the sound discretion of the trial court, whose ruling will not be reversed unless it reflects an abuse of that discretion." *Snelson v. Kamm*, 204 Ill. 2d 1, 36 (2003).

"To prove a claim of medical malpractice a plaintiff must show that (1) there was a standard of care by which to measure the defendant's conduct, (2) the defendant negligently breached that standard of care, and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Alm v. Loyola University Medical Center*, 373 Ill. App. 3d 1, 6 (2007). "Each element must be presented by expert testimony." *Alm*, 373 Ill. App. 3d at 6-7. "Whether there is a deviation from the standard of care and whether the deviation was a proximate cause are normally questions for the jury." *Aguilera v. Mount Sinai Hospital Medical Center*, 293 Ill. App. 3d 967, 971 (1997).

With regard to proof of the applicable standard of care and proof that it went unmet, "[a] physician or surgeon is bound to possess and use reasonable skill, not perhaps the highest degree of skill that one learned in the profession may acquire, but reasonable skill such as physicians in good practice ordinarily use and would bring to a similar case." *Pugh v. Swiontek*, 115 Ill. App. 2d 26, 30 (1969). "The exercise of skill and care is applicable to diagnosis as well as treatment." *Pugh*, 115 Ill. App. 2d at 30. "As correlaries [*sic*] to the foregoing rules, it can also be said that a physician is not an insurer of satisfactory results, that unsuccessful results are not evidence of negligence[,] and that mere mistakes or errors are not negligence." *Pugh*, 115 Ill. App. 2d at 30-31. "Where *** there is admittedly a misdiagnosis, the question remains as to whether such misdiagnosis was the exercise of a reasonable medical judgment or a judgment arrived at without the exercise of appropriate care." *Pugh*, 115 Ill. App. 2d at 31.

With regard to the evidence demonstrating Dr. Jha's breach of the standard of care, Dr. Barnhart, Dr. Jha's retained expert, testified that pericarditis is a clinical diagnosis wherein the physician must take an initial history and consider test results to reach an analytical conclusion and that the standard of care would require the doctor to have a thorough understanding of the patient's history. As argued by the plaintiffs, the evidence demonstrated that Dr. Jha breached the standard of care when he failed to fully investigate and inquire about Kevin's history and did not obtain sufficient information to make an appropriate clinical diagnosis.

The evidence at the trial demonstrated that Kevin wrote in the "Welcome to Our Practice" form that he was experiencing chest pain and related it to his gallbladder surgery. Kevin testified that Dr. Jha did not inquire about his recent gallbladder surgery and did not question him about the specific type of chest pain he was having. Dr. Moss testified that there was no indication in Dr. Jha's record that he inquired about the precise nature of Kevin's chest pain, which would be something to note to differentiate between pericarditis and a bile leak. Dr. Moss also testified that, considering a patient's recent surgery to remove the gallbladder, a reasonably competent surgeon would need to determine whether or not there was a biloma or bile leak, by drawing blood and performing an ultrasound.

Likewise, Dr. Stein testified that the lower part of the chest contains parts of the abdomen, and he indicated that "chest pain" could be coming from the liver and gallbladder, as well as other organs. Dr. Stein also testified that nothing in Dr. Jha's record suggested that he questioned Kevin about his gallbladder surgery or his biliary system. Dr. Stein testified that a reasonably competent physician

would have asked about the gallbladder surgery and the relationship between the symptoms and the gallbladder surgery. Dr. Stein testified that, considering the history of gallbladder surgery reported, a reasonably competent physician should have investigated Kevin for a surgical complication.

Dr. Stein testified that to diagnose pericarditis, the physician should inquire about the type of chest pain. Dr. Stein testified that Dr. Jha's records indicated that there was no pericardial rub, no characteristic EKG findings, no fever, and no characteristic pulse or heart rate results typically suggestive of viral pericarditis. Dr. Stein testified that a reasonably prudent physician in this case would not have diagnosed Kevin with pericarditis without obtaining additional information, including a follow-up EKG, a chest X-ray, or an echocardiogram.

Dr. Stein testified that, based on the records, Dr. Jha diagnosed pericarditis only on Kevin's assertion that he felt better leaning forward and worse lying down. Dr. Stein testified that a reasonably competent physician could not diagnose pericarditis on this symptom alone. Dr. Stein testified that, to a reasonable degree of medical certainty, considering Kevin's continuing complaints of pain on September 6 or 7 and the negative testing for cardiac problems in Kansas City on September 12, Kevin did not have pericarditis.

Accordingly, the evidence demonstrated that Dr. Jha did not fully investigate or conduct sufficient tests to enable him to have a clear idea of the situation when he diagnosed Kevin with pericarditis. The evidence demonstrated that Dr. Jha breached the standard of care by failing to obtain a thorough history, failing to fully investigate the cause of Kevin's pain, and failing to order additional testing that would have revealed a bile leak. The evidence at the trial demonstrated that Dr. Jha's misdiagnosis did not result from the exercise of reasonable medical judgment arrived at with the exercise of appropriate care.

Dr. Jha also argues that his alleged breach of care in failing to diagnose and treat the duct leak was not the proximate cause of Kevin's damages. Dr. Jha argues that there was no evidence that if he had performed the appropriate tests, he would have detected the bile leak. However, the evidence that the Kansas City physicians performed the appropriate tests and determined that Kevin suffered from a bile leak belies this assertion by Dr. Jha.

Alternatively, Dr. Jha argues that the evidence did not reveal a potential treatment for Kevin's condition. Dr. Jha argues that there was no evidence of what would have been done if he had diagnosed the bile leak. Dr. Jha also argues that no expert opined that there was an available treatment to alleviate or repair the bile leak on September 2,

1999, if he would have made the appropriate diagnosis. Thus, Dr. Jha argues, the plaintiffs failed to establish proximate cause.

The plaintiffs argue that the expert testimony demonstrated if the bile leak had been diagnosed prior to the rupture of the biloma, it could have been treated by nonsurgical "percutaneous draining" on an outpatient basis in lieu of the seven-day hospitalization in Kansas City and the resulting collateral losses.

" 'Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible.' " *Johnson v. Loyola University Medical Center*, 384 Ill. App. 3d 115, 121 (2008), quoting *Ayala v. Murad*, 367 Ill. App. 3d 591, 601 (2006). " '[T]o sustain the burden of proof, a plaintiff's expert must demonstrate within a reasonable degree of medical certainty that the defendant's breach in the standard of care is more probably than not the cause of the injury.' " *Bergman v. Kelsey*, 375 Ill. App. 3d 612, 625 (2007), quoting *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 549 (2005). A plaintiff need not present unequivocal or unqualified evidence of causation but must meet his burden through the introduction of circumstantial evidence from which a jury may infer connected facts that usually and reasonably follow according to common experience. *Bergman*, 375 Ill. App. 3d at 625. "The weight, sufficiency[,] and credibility assessed to medical expert testimony is within the province of the jury, as is, ultimately, the resolution of evidentiary conflicts with respect to the factual question of proximate cause." *Bergman*, 375 Ill. App. 3d at 625-26.

Dr. Failing testified that in Kansas City, percutaneous drainage was not attempted because the drain must be placed adjacent to the bile leak or in that fluid collection to decompress it, and the radiologist did not see a fluid collection in which to place the drain. Dr. Moss testified that Kevin developed a bile leak approximately two days after his surgery and that the leak was contained within a biloma, which ruptured on September 12, 1999, in Kansas City, spilling bile into Kevin's abdomen. Dr. Moss testified that if the proper tests had been performed and a biloma had been detected prior to its rupture, a relatively simple procedure, "swallowing [a] hose pipe, ERCP with a—what [is] call[ed] a sphincterotomy, would have treated the problem."

Likewise, Dr. Stein testified that the biloma, or collection of fluid, would have been much easier to percutaneously drain. Dr. Stein testified that "[i]f the drainage was obtained percutaneously, they might have only needed to do one ERCP to place the [stent], another ERCP to remove the [stent]," as opposed to the unsuccessful ERCP, the

surgical procedure, and the subsequent ERCP and removal of the stent. Dr. Stein explained that there was not a biloma at the time of Kevin's surgery in Kansas City because the biloma is a balloon and the balloon had already burst, leaving fluid down to the pelvis, as described by the Kansas City surgeon. Dr. Stein testified, "You can't just stick a [stent] in and drain the fluid out of the balloon if the balloon has already burst." Dr. Stein testified that had the biloma been diagnosed prior to its rupture, the physicians could have performed an ERCP and if the ERCP failed for a failure to place the stent, the radiologist could have placed the drain percutaneously, on an outpatient basis.

Although the defendants' experts disputed the testimony of the plaintiffs' experts regarding the standard of care and the proximate cause of injury, these disputes are the type that juries are expected to resolve through weighing the experts' merit and their positions. See *Bergman*, 375 Ill. App. 3d at 626. This court will not substitute its judgment for that of the jury. See *Bergman*, 375 Ill. App. 3d at 622-23. Accordingly, we cannot conclude that all the evidence, viewed in the light most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. We also cannot conclude that the jury's verdict was against the manifest weight of the evidence.

## Trial Errors

■ Dr. Jha argues that because the circuit court committed errors during the trial, he is entitled to a new trial. Initially, Dr. Jha argues that the circuit court erred in barring Dr. Casperson's response to his question regarding whether Dr. Casperson believed that he breached the standard of care in failing to diagnose Kevin's biloma or bile leak.

Dr. Casperson had testified, in response to a question from the plaintiffs' counsel, that the postural symptom alone was not sufficient to diagnose pericarditis. Dr. Jha's counsel posed the question that, even if it had been insufficient, did Dr. Casperson believe that Dr. Jha breached the standard of care in failing to diagnose a biloma or bile leak? When the plaintiffs' counsel objected, the circuit court sustained the objection and barred Dr. Casperson from responding. Dr. Jha argues that the anticipated answer would have clarified the distinction between so-called "best practices" and the "standard of care." Dr. Jha argues that the circuit court abused its discretion in cutting off the line of questioning, depriving him of a fair trial.

The plaintiffs counter that the circuit court properly sustained their objection because there had been no disclosure of Dr. Casperson as an expert witness for Dr. Jha and because the question was beyond

the scope of the rebuttal direct examination. The plaintiffs also argue that because Dr. Jha made no offer of proof after the circuit court sustained the plaintiffs' objection, this issue is waived. Dr. Jha fails to reply to these contentions in his reply brief and gives no reason, for example, why his failure to make an offer of proof did not waive this issue.

When a party seeks to have a reviewing court determine whether the trial court's evidentiary rulings unduly restricted the examination of a witness, the record must clearly reveal what the witness's testimony would have been and what purpose the testimony would have served. *Holder v. Caselton*, 275 Ill. App. 3d 950, 955 (1995); *Betts v. Manville Personal Injury Settlement Trust*, 225 Ill. App. 3d 882, 909 (1992). "Counsel makes an adequate offer of proof if she informs the trial court, with particularity, of the substance of the witness'[s] anticipated answer." *Holder*, 275 Ill. App. 3d at 955. "The failure to make an adequate offer of proof waives the issue on appeal." *Holder*, 275 Ill. App. 3d at 955; see also *Carter v. Azaran*, 332 Ill. App. 3d 948, 956 (2002) ("Ordinarily, where a party fails to make an offer of proof as to excluded testimony, that party waives any claim that the testimony was improperly excluded"). Here, Dr. Jha's attorney failed to make an adequate offer of proof; therefore, this issue is waived.

■ Dr. Jha also argues that he is entitled to a new trial because the circuit court abused its discretion by instructing the jury that the plaintiffs may recover damages for the value of the sick time that Kevin used. Dr. Jha argues that the previously accumulated sick time had no intrinsic value and that Kevin's accumulation of as much sick time as his employer allows squarely refutes the notion that his use of sick time in 1999 represents any loss at all, let alone a compensable one.

The plaintiffs counter that Illinois law clearly provides that Kevin, who was required to use a benefit to replace earnings he would have earned but for his absence from work by reason of the tortious conduct of Dr. Jha, is entitled to recover the value of that benefit.

"If the jury instructions fairly and accurately state the law, reversal is not required even though the jury may have been instructed in an alternative manner that would have been equally acceptable." *Lambie v. Schneider*, 305 Ill. App. 3d 421, 427 (1999). In Illinois, a plaintiff is entitled to recover the full value of time lost from work, without regard to benefits received from his employer. *Boden v. Crawford*, 196 Ill. App. 3d 71, 76 (1990). "The justification for this rule is that the wrongdoer should not benefit from the expenditures made by the injured party or take advantage of contracts or other relations that may exist between the injured party and third persons." *Wilson v. Hoffman Group, Inc.*, 131 Ill. 2d 308, 320 (1989).

In *Hoobler v. Voelpel*, 246 Ill. App. 69 (1927), the plaintiff was away from work approximately six weeks. The plaintiff received pay from his employer for the time he was unable to work because he was allotted time for vacation and sick leave. The plaintiff exhausted six weeks of his accumulated sick leave and vacation periods. The court concluded that the employer's payment for sick time to the plaintiff cannot operate to reduce the damages recoverable against a tortfeasor.

Likewise, in *Boden*, 196 Ill. App. 3d 71, the plaintiff suffered an injury to his back and lost time from work. Pursuant to his employment, he was entitled to a disability leave and received a payment of more than 50% of the previous year's salary. The appellate court held that the plaintiff was entitled to recover the full value of the time he lost from work, without regard to the disability benefit received by the plaintiff from his employer.

The evidence at the trial demonstrated that Kevin's hourly rate in 1999 was $25.49 and that he used 280 hours of sick leave as a result of the events in Kansas City. The jury awarded Kevin $7,000 as the reasonable value of benefits lost for Kevin (280 times $25.49 totals $7,137.20). Pursuant to Illinois law, Kevin was entitled to recover the value of the time lost from his employment, despite his employer's allowance of sick time. The record supports the jury's award.

■ Dr. Jha argues that he is entitled to a new trial because the plaintiffs' counsel engaged in unduly aggressive questioning of Dr. Jha at the trial, precluding a full and complete examination of the events of Kevin's examination, with the effect of misguiding the jury.

We have reviewed the record. The plaintiffs' attorney's cross-examination of Dr. Jha did not rise to the level of abuse and prejudice found in the cases cited by Dr. Jha. See *People v. Lyles*, 106 Ill. 2d 373, 402 (1985) (considering the prosecutor's inexcusable, grossly unprofessional, and highly inflammatory characterization of the witness as a prostitute, taken together with the prosecutor's other insulting and demeaning comments, there was no question that the prosecutor sought to humiliate and degrade the witness in the eyes of the jurors); *Lee v. Calfa*, 174 Ill. App. 3d 101, 113 (1988) (counsel made improper statements in the form of the personal abuse of a witness and the belittling of an adversary, throughout a record exceeding 600 pages, that could not be classified as isolated and inadvertent but reflected a persistent effort to prejudice the jury); *Regan v. Vizza*, 65 Ill. App. 3d 50, 53 (1978) (the plaintiff's medical expert was compared to " 'a hired gun in the old west,' " and a parallel was suggested between the television character in " 'Have Gun Will Travel' " and the doctor who has " 'medical testimony will travel' "). Accordingly, we cannot say that Dr. Jha was denied a fair trial on this basis.

In sum, we find that Dr. Jha is not entitled to a judgment notwithstanding the verdict or a new trial.

## CONCLUSION

For the foregoing reasons, the judgment entered by the circuit court of Marion County is hereby affirmed.

Affirmed.

WELCH and STEWART, JJ., concur.