**Joscelyn JOHNSON, Individually and as Special Administrator of the Estate of Nakia Marie–Amore Burress, Deceased, Plaintiff,**

v.

**UNITED STATES of America, and Emanuel Javate, M.D., Defendants.**

No. 10 C 8251

United States District Court,
N.D. Illinois, Eastern Division.

Signed September 5, 2014

Donald A. Shapiro, Matthew R. Basinger, Donald A. Shapiro, Ltd., Chicago, IL, for Plaintiff.

AUSA, Harpreet Kaur Chahal, United States Attorney's Office, Bradford D. Roth, Jeffrey Aaron Hesser, Cassiday Schade LLP, Chicago, IL, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Honorable THOMAS M. DURKIN, United States District Judge

Joscelyn Johnson, individually and as the special administrator of the estate of Nakia Marie–Amore Burress, deceased, filed this lawsuit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80, alleging medical malpractice during the delivery of her baby, Nakia. Johnson alleges that Dr. Emanuel Javate breached the standard of care in four ways and that one or more of the breaches proximately caused the death of her baby. Former defendants Lori Schwartz, R.N., and Schwartz's employer, Sisters of St. Francis Health Services, Inc., settled with Johnson. R. 54; R. 72. The case proceeded to a four-day bench trial in January 2014, during which the Court heard testimony from numerous lay and opinion witnesses. The Court asked the parties to submit their proposed findings of fact and conclusions of law, which they both did. R. 67; R. 68; R. 69. This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). These findings are based on the stipulations and submissions of the parties, documentary evidence, and testimony at trial. They are also the result of the Court's credibility determinations after observing each of the witnesses testify at trial. In light of the Court's factual findings and conclusions of law, the Court finds in favor of Johnson and enters judgment against the United States.

## FINDINGS OF FACT

### I. Background—Risk Factors

Johnson was approximately 5'1", 200 pounds at the time of her delivery. Tr. 288, 293. Johnson had "some borderline high blood pressure," and Dr. Javate considered her to be hypertensive and, thus, a high risk patient—discussed further below. Tr. 70. A pregnant patient who is hypertensive has an increased risk of placental abruption or separation,[1] which can manifest itself through vaginal bleeding. Tr. 70, 548, 605–06. Dr. Javate also considered Johnson a high-risk patient because she was diagnosed as a gestational diabetic (which carried with it the risk of delivering a larger baby), and was obese. Tr. 69–70, 163–64, 173. Johnson already had a history of macrosomia, which means giving birth to large babies. Tr. 66. Indeed, an ultrasound performed on February 8, 2008, revealed that Johnson's baby was already at least 9 pounds. Tr. 317. When a larger baby is delivered, there is an increased risk for shoulder dystocia and the baby suffering a brachial plexus injury.[2] Tr. 68.

1. A placental abruption is a complication of pregnancy that occurs when placental lining separates from the mother's uterus. *See* "Placental Abruption," *Wikipedia,* http://en.wikipedia.org/wiki/Placental_abruption (last visited Sept. 2, 2014). The Court notes that its references to Wikipedia are purely for background information for the reader and that the Court is not in any way relying on the information to make its factual and legal determinations here.

2. Shoulder dystocia refers to when a baby's shoulders become wedged in the birth canal during delivery. *Stapleton v. Moore,* 403 Ill. App.3d 147, 342 Ill.Dec. 360, 932 N.E.2d 487, 492 (2010). The brachial plexus is a group of nerves that extends from the spinal cord to the muscles of the shoulder, arm, forearm, and hand that can be damaged when a physician attempts to dislodge the baby's shoulder. *Id.*

Johnson's due date was February 20, 2008. Tr. 510.

## II. Johnson's Delivery at St. James Hospital

### A. Early Stages of Labor: February 8, 2008, 11:00 a.m. to February 9, 2008, 7:30 a.m.

Dr. Javate saw Johnson at St. James Hospital in Chicago Heights on the morning of February 8, 2008. Tr. 67. Johnson went to the hospital for a non-stress test and a "biophysical profile," Tr. 75, which are fairly routine evaluations. Dr. Javate examined Johnson and decided that she should be admitted to the hospital that day to be induced into labor. Tr. 71. This decision was made in response to the fact that Johnson was a high-risk patient—i.e., "was diabetic and ... was having borderline hypertensive readings"—and that her baby might "grow too big." Tr. 7172. At the time, Johnson had been carrying her child for just over 38 weeks. Tr. 72. Forty weeks is considered "full term." Tr. 72. Even though Johnson was already at the hospital, Dr. Javate said she could go home and pack before returning to the hospital to be admitted. Tr. 631. Later that day, at 6:44 p.m., Johnson was admitted through the emergency room to St. James Hospital for induction of labor. Exh. 1 at 29.[3]

All patients at St. James Hospital are typically assigned a one-on-one labor and delivery nurse who is responsible for monitoring the fetal and maternal statuses. Tr. 177–78, 183. To satisfy that obligation, the nurse is required to take and record a patient's blood pressure and heart rate (or pulse) every hour. Tr. 26566; Exh. 6 at 424. The nurse also must evaluate the fetal monitoring strips—printed recordings of the fetal heart rate from external monitors that are attached to the patient—and report any "non-reassuring" pattern on the strips to the attending physician. Exh. 7 at 427. A non-reassuring pattern may be an indication that the baby is not receiving a sufficient amount of oxygen. Tr. 534–35. It is exemplified by a heart rate variation that is not within the normal limits for a fetus, which is usually 120 to 160 beats per minute ("bpm"). Tr. 796. Furthermore, the nurse is also tasked with numerous other responsibilities, including performing regular vaginal examinations, Exh. 5; evaluating the patient's contractions every 30 minutes; evaluating "bloody shows" (explained further below); evaluating the patient's complaints of pain, Exh. 6; administering medications like Cervidil and Pitocin to induce and augment delivery at the direction of the attending physician, Exh. 9, Exh. 10; and assisting the physician during delivery, Exh. 12. If there are any abnormalities in the labor process, including fetal heart rate, contractile patterns, or vital signs, the nurse is required to report that to the attending physician—in this case, Dr. Javate. Tr. 179, 182–83.

At 9:50 p.m., at Dr. Javate's direction, Johnson was given Cervidil to assist with the induction. Tr. 76. Cervidil is a "prostaglandin drug" that, in essence, "primes the uterus" for delivery. Tr. 73. About three-and-a-half hours later, at 1:23 a.m. on February 9, 2008, Dr. Javate visited Johnson to evaluate the maternal and fetal status of Johnson and her baby. Tr. 77. Johnson was sleeping when Dr. Javate arrived. Tr. 632–33. Nurse Wagner was Johnson's one-on-one nurse at the time. Tr. 689; Exh. 1 at 141–42. Upon examina-

---

**3.** The parties filed a joint binder that included numerous exhibits encompassing Johnson's medical records and the records from her labor and delivery, St. James Hospital's policies and procedures, and other information relevant to the case.

tion of Johnson, Dr. Javate determined that there were good fetal heart tones and noted that Johnson was comfortable. Exh. 1 at 74. He left the hospital shortly thereafter. Tr. 77. Nurse Wagner continued to tend to Johnson throughout the night and verified that Johnson and her baby were doing fine. Tr. 77, 189. Johnson's heart rate and blood pressure readings were normal during that time period, confirming Nurse Wagner's evaluation. Exh. 1 at 141–44. For example, at 3:51 a.m., Johnson's heart rate was 79 bpm and her blood pressure was 136/78. Exh. 1 at 143. A normal heart rate for a woman not in labor is generally between 60 and 100 bpm. Tr. 176, 284. A normal blood pressure is generally anything less than 140/90. Tr. 176.

At 7:00 a.m., Johnson had a spontaneous rupture of membranes, Exh. 1 at 144, which means that her water broke, and was now committed to delivering the baby. Tr. 195–96. Nurse Wagner performed a vaginal examination to confirm the finding. Exh. 1 at 144. At approximately 7:15 a.m., Dr. Javate was notified that Johnson's delivery was progressing quickly and that Johnson was dilating approximately 1 centimeter per hour. Tr. 128.[4] At 7:35 a.m., Nurse Wagner made an entry in the nurses' notes indicating that she had contacted Dr. Javate to report on her vaginal examination. Exh. 1. at 144. She also made a note in regards to Dr. Javate: "Presence Requested." Dr. Javate does not have an independent recollection of what was said during the conversation.[5] Tr. 199. At the same time Nurse Wagner was entering her notes in the system, the nurse taking over for her, Nurse Lori Schwartz, made a note that Johnson was restless with an "urge to push." Exh. 1 at 144. Johnson testified that she woke up in the morning around 7:30 a.m. with pain she associated with "going-through-labor pains" and that she informed Nurse Wagner of the pain. Tr. 633.

### B. February 9, 2008—8:00 a.m. to 11:00 a.m.

Dr. Javate returned to the hospital at 8:00 a.m. but he did not visit Johnson in her room or perform an evaluation of her. Tr. 78–79, 209–10. In fact, he did not personally check on Johnson until over three hours later at 11:04 a.m. Tr. 209–10. Between 8:00 a.m. and 11:04 a.m. on February 9, 2008, Johnson was the only patient in labor at the hospital, though Dr. Javate had other postpartum and gynecological patients to evaluate. Tr. 78. It is undisputed that patients who are in active labor take priority over non-laboring patients who are in the hospital. Tr. 7879, 800.

At 8:20 a.m., Nurse Schwartz noticed that Johnson had vaginal bleeding that she characterized as a "good bloody show." Tr. 277; Exh. 1 at 145. A "bloody show" is a "combination of [a] small amount of blood that a [patient in labor] can get from [a] cervical change [that includes a] moderate amount of blood mixed with secretions in the vagina, mucus material." Tr. 211–12. Nurse Schwartz testified that the blood was fresh, red, and liquid, and did not contain any mucus and that she considered it to be a normal incident of labor. Tr. 269–70. At approximately 8:30 a.m., Nurse Schwartz communicated her findings of the bloody show to Dr. Javate, Tr. 277, as well as the overall maternal status of Johnson. Tr. 204–05; Exh. 1 at 145.

---

4. Dr. Javate's note supporting this observation was made at 2:40 p.m., hours after Johnson's delivery had concluded. Tr. 128.

5. Nurse Wagner did not testify at trial, so the Court cannot evaluate her testimony or recollection of the phone conversation.

She also told Dr. Javate that Johnson had requested to see him. Tr. 275. She did not, however, report the vital signs of Johnson because they had not been taken since 7:30 a.m, even though hospital policy and procedures required them to be taken hourly. Tr. 88, 273. Nurse Schwartz could not remember if Dr. Javate had requested the vital signs at that time, though it is undisputed that Dr. Javate did not go into Johnson's room to evaluate her or learn of Johnson's vitals after being informed of the first bloody show. R. 273–74.

At 8:57 a.m., Dr. Javate was present at the nurses' station, and Nurse Schwartz informed him that Johnson was 8 centimeters dilated. Exh. 1 at 145. A woman is "fully dilated" at 10 centimeters. Tr. 181; see Tr. 615; Exh. 146. At 9:00 a.m., Nurse Schwartz informed Dr. Javate of a second bleeding episode; this one characterized as a "large bloody show." Tr. 90. Nurse Schwartz testified that it had "clear amniotic fluid" and that she did not "see any sign of heavy bleeding." Tr. 287. Nurse Schwartz described the episode as being no different than what she had seen many times before; however, the blood mark on the pad under Johnson was at least a "few inches" larger than the first bloody show. Tr. 287. Again, Dr. Javate did not request or learn of Johnson's vitals, or enter the room to personally examine the consistency, color, or texture of the bloody show. Tr. 83, 85, 240–41. He simply "presumed the vitals were normal." Tr. 240. Dr. Javate also testified that he did not rule out the possibility at that time that Johnson was suffering from a placental abruption or internal bleeding. Tr. 240.

Between the hours of 7:30 a.m. and 9:30 a.m., Johnson's blood pressure and heart rate were not taken. Tr. 266, 277–78, 308. At 9:30 a.m., Johnson's heart rate was 146 bpm, which is "tachychardic," or abnormally high—normal is generally between 60 to 100 bpm. Tr. 98. Dr. Javate never received this information, even though he had numerous methods to obtain it. Tr. 98. He could have: (1) asked for the attending nurse to pull up the vitals, Tr. 98; (2) looked through the nurses' notes on the computer at the nurses' station; or (3) checked Johnson's heart rate himself, Tr. 216, 272. Prior to 11:15 a.m., Dr. Javate never asked for Johnson's vitals or asked Nurse Schwartz to repeat Johnson's vitals to verify their accuracy. Tr. 100, 288–89.

Labor itself may increase a woman's pulse as a result of pain and the stress of pushing, but a pulse over 120 bpm could be of concern and should be investigated. Tr. 406–07. Other causes of a heart rate that high during labor are fever, infection, severe pain, or internal bleeding. Tr. 98. Nurse Schwartz did not view the 146 heart rate as unusual, testifying, "It's high. For a woman in pain, [however,] I felt that it was acceptable." Tr. 284. At that time, Johnson was not in severe pain, as she had only received the prescription medication Stadol at 7:00 a.m. and had not requested any additional pain medication. Tr. 98–99, 286. She also did not have a fever or any infection. Tr. 285–86, 406. Prior to the 9:30 a.m. reading, the highest Johnson's heart rate had been during her labor was 79 bpm, when it was taken at 7:33 a.m. Exh. 1 at 141–46. The nurses' notes indicate that Nurse Schwartz entered the vital information obtained at 7:33 a.m. into the nursing log at 8:37 a.m. Tr. 310–13; Exh. 1 at 144. The vitals were not, however, automatically printed in the nurses' notes or onto the fetal monitor strips at either 7:33 a.m. or 8:37 a.m.[6] Exh. 2 at 323–30.

---

6. Nurse Schwartz testified that she took the vitals sometime between 7:30 a.m. and 9:30 a.m., but the computer did not save or record them. Tr. 308. That testimony is not credi-

An external tocodynamometer ("tocometer") is a device that is attached to a woman's abdomen with a strap around her midsection and used to measure· and record a woman's uterine contractions. The tocometer had been continuously picking up moderate to strong contractions throughout the morning of Johnson's delivery, including at 7:29 a.m.; 7:47 a.m.; 8:07 a.m.; 8:19 a.m.; 9:10 a.m.; 9:41 a.m.; and 10:02 a.m. Exh. 1 at 144–45; Exh. 2(b) at 340. At 10:08 a.m., the tocometer attached to Johnson stopped recording contractions. Tr. 117; Exh. 2(b) at 340. This could have meant one of two things: either Johnson stopped having contractions or the machine was no longer able to pick up the contractions, which is not necessarily an unusual occurrence. Tr. 118. The second scenario is more likely true because Nurse Schwartz was able to palpate (feel using her hands) strong uterine contractions all the way up to 11:00 a.m. Tr. 118, 828. At 11:04 a.m., the tocometer was noted to be "adequately placed on [Johnson's] abdomen," despite the fact it was no longer picking up any contractions. Tr. 129. If there are difficulties when measuring a mother's contractions, an intrauterine pressure catheter can be inserted into the mother to more accurately measure the strength of the uterine contractions. Tr. 119. No intrauterine pressure catheter was ever used during· Johnson's delivery. Tr. 119.

Another important piece of data used in conjunction with the tocometer recordings is the information contained on the fetal heart monitor strips because they provide information on how the baby is doing dur-ing the course of labor. Tr. 107. The fetal heart monitor strips can show "late decelerations"—defined as a decrease in fetal heart rate beginning at the middle of a contraction and returning to baseline after the contraction is over, Tr. 391, 535—which is indicative of the baby not getting enough oxygen during the delivery, Tr. 114–16, 360. The fetal monitoring strips from Johnson's delivery between 7:10 a.m. and 8:10 a.m. showed recurring late decelerations.· Tr. 534. The baseline of the baby's heart rate was between 140 and 150 bpm, which decreased to 120 bpm after the beginning of the contractions and then returned to the baseline after the contractions ceased. Tr. 114, 543–44. This suggests the baby was not receiving a sufficient amount of oxygen. Tr. 534. Fetal monitoring strips showing late decelerations are considered non-reassuring. Tr. 534–35.

Between 7:40 a.m. and 9:00 a.m., the contraction readings were "not very distinct," Tr. 114–16, and the fetal heart strips were difficult to read, rendering it "difficult to tell whether [the heart patterns] were early, variable, or late decelerations," Tr. 392. Dr. Javate never viewed the fetal monitoring strips after he arrived at the hospital between 8:00 a.m. and 11:04 a.m., however, so he was unaware of that information. Tr. 107. When the readings from fetal heart strips become difficult to interpret, an internal fetal heart electrode monitor can be placed on a fetus's scalp to provide more accurate readings. Tr. 119, 746, 813. No internal scalp electrode monitor was ever used during Johnson's delivery. Tr. 119.

---

ble. The machine was not broken, Nurse Schwartz did not file a report explaining that the machine was broken, and Nurse Schwartz had never previously seen a working machine fail to record the vitals. Tr. 308. The Court finds that, for whatever reason, the vitals were not taken. However, while it may have been Nurse Schwartz' responsibility to take the vitals in a timely manner, as relevant later, it was Dr. Javate's responsibility to evaluate them and, if they had not been taken, order that they be obtained. Dr. Javate failed to do so.

The nurses' notes at 10:11 a.m. indicate that a vaginal exam performed on Johnson revealed that Johnson was fully dilated, which meant she was almost ready to deliver the baby. Tr. 317; Exh. 1 at 146. Nurse Schwartz also noted that the baby was at +1 station. Exh. 1 at 146. The finding of a +1 station indicated that labor was progressing because a prior entry made at 8:34 a.m. revealed the baby was at 0 station. Exh. 1 at 145. "Station" refers to the position or location of a baby in the birth canal. *See* "Station," *Medical–Dictionary,* http://medical–dictionary.thefree dictionary.com/station (last visited Sept. 2, 2014). A "0 station" designation would refer to furthermost portion of the baby's head—assuming the baby is not breeched—being at an imaginary plane at the level of the ischial spines, which the arrows point to in the exhibit below. *Id.* Each number represents the estimated number of centimeters the baby is above or below that imaginary plane, with "minus" designations meaning the baby is further up the birth canal and "plus" designations indicating the baby is closer to being delivered. The following exhibit, which was used at trial, illustrates where a baby's head is located at a given station designation:

At 10:25 a.m., Nurse Schwartz noted that "contractions [were] not recording" and Johnson had lost the urge to push. Exh. 1 at 146. Sixteen minutes later, at 10:41 a.m., Nurse Schwartz made a note that Johnson was in a "High Fowlers" position,[7] or sitting upright, Tr. 296, 779, and was being "Coached on Pushing." Exh.

7. The High Fowler's position is when a patient is sitting up on a bed with the head of

1 at 146. Even though the monitor was no longer picking up uterine contractions around that time, Johnson told Nurse Schwartz that she was having them. Tr. 293–94; Exh. 1 at 146. Indeed, Nurse Schwartz testified that she palpated contractions up until 11:00 a.m., Tr. 293–94, and more than likely communicated that information to Dr. Javate. Tr. 244.

## C. February 9, 2008—11:00 a.m. to 11:33 a.m.

At 11:04 a.m., Johnson's delivery took a turn for the worse. Exh. 1 at 146. The baby's head had been at +1 station, which can be described as being "deeply wedged into the birth canal," during Nurse Schwartz's latest vaginal examination at 10:11 a.m. Tr. 294; Exh. 1 at 146. Shortly after 11:00 a.m. Nurse Schwartz performed another vaginal exam and discovered that the baby's head had receded up the vaginal canal to a −3 station. Tr. 296. This was the first time Nurse Schwartz had ever encountered a situation where a baby had receded up the birth canal in such a significant manner. Tr. 296. She also "felt a bulging in the wall of the vagina." Tr. 302. Accordingly, Nurse Schwartz immediately summoned Dr. Javate, who entered the room within seconds of Nurse Schwartz's request. Tr. 296–97. Nurse Schwartz informed Dr. Javate that the baby's head had gone straight up and receded from a +1 or +2 station to a −3 station. Tr. 127, 297. The fetal heart rate at that time *appeared* to be in the 140's "with no obvious decelerations [and] minimal variability." Tr. 129. Dr. Javate then performed his own vaginal examination, which confirmed that the baby's head had receded to a −3 station. Tr. 127–29. He

did not view Johnson's vitals that were taken at 9:30 a.m., Tr. 226–27, nor did he take Johnson's vitals at that time or ask Nurse Schwartz to take Johnson's vitals. Tr. 132–33. He did, however, note that Johnson appeared to be alert and oriented, was not light-headed, and denied being in severe pain. Tr. 222. He also noted that there was no "brisk bleeding." Tr. 223.

Dr. Javate was in the room for approximately 4 to 5 minutes before going back into the hallway. Tr. 225–26. At that point, his suspicion of a uterine rupture was "very low" because Johnson "never had a scarred uterus" and a uterine rupture is "such a rare, rare, rare thing to happen." Tr. 222; *see* Tr. 563–64. Dr. Javate thus diagnosed Johnson as having "an ineffectual contractile pattern," Tr. 224, and ordered Nurse Schwartz to start Pitocin in Johnson's IV line before leaving the room. Tr. 127–29, 428; Exh. 1 at 146. Pitocin is a prescription drug intended to increase the strength or duration of a woman's labor contractions, Tr. 139. In reality, however, Johnson's uterus had likely ruptured around 11:04 a.m. Tr. 14647, 563–64. The nurses' notes indicate Pitocin was started at 11:05 a.m., Exh. 1 at 146, but Nurse Schwartz testified that 11:05 a.m. was when she entered the order for Pitocin into the computer system. Tr. 298–99. She further testified that the Pitocin bag was not actually hooked up to Johnson's IV until a few minutes after 11:05 a.m. Tr. 298–301.

After leaving Johnson's delivery room, Dr. Javate discussed Johnson's condition with his colleague, Dr. Dexter Arrington. Tr. 134–35. Dr. Javate got the idea during that conversation that the heart rate shown on the fetal monitor may have been Johnson's, rather than her baby's. Tr.

---

the bed elevated as high as possible, usually between 60 to 90 degrees. "High Folwer's Position," *Wikipedia*, http://en.wikipedia.org/ wiki/High_Fowler%27s_position (last visited Sept. 2, 2014).

134–35. Indeed, it is a "known fact" that external fetal monitors sometimes pick up the mother's heartbeat instead of the baby's. Tr. 408. Dr. Javate then returned to Johnson's room at approximately 11:15 a.m., at which time he (for the first time) requested that Nurse Schwartz take Johnson's vitals.[8] Tr. 134, 139–40. Nurse Schwartz stopped the Pitocin[9] and then took Johnson's vitals at 11:16 a.m., which were abnormal. Tr. 139–40, 298–301. Johnson's heart rate was 146 bpm (a high reading for a woman in labor) and her blood pressure was 65/43 (a very low reading, meaning Johnson was hypotensive). Tr. 139–40, 418; Exh. 1 at 146. When a patient's blood pressure drops significantly, the patient's heart rate increases as a "compensatory mechanism ... to keep the patient alive." Tr. 140. The drop in Johnson's blood pressure was due to bleeding from the uterine rupture that must have occurred prior to the reading. Tr. 418, 56566.

Dr. Javate did not immediately call for a cesarean section ("C-section") after learning of Johnson's vitals. Tr. 141–43. He instead had Nurse Schwartz repeat taking Johnson's vitals a second and third time to confirm that the blood pressure cuff had been properly placed and that the reading was accurate. Tr. 141–43. At 11:17 a.m., Johnson's blood pressure was 68/37, and at 11:19 a.m., it was 57/31. Tr. 141; Exh. 1 at 146. Johnson's heart rate was 141 bpm at 11:16 a.m. and 135 bpm at 11:19. Exh. 1 at 146.[10] Upon learning this information, Dr. Javate diagnosed a uterine rupture and called for a C-section at 11:19 a.m., 15 minutes after he first learned that the baby had gone from a +1 station to a −3 station. Tr. 141, 143, 14647.

Johnson's baby was delivered 14 minutes later at 11:33 a.m. Tr. 233. During the surgery, Dr. Javate found the entire baby floating in Johnson's abdomen cavity in a pool of blood; she had been fully extruded from the uterus. Tr. 144, 233, 248. Johnson had suffered a uterine rupture and a placental abruption. Tr. 595. At least a liter of blood was discovered in Johnson's abdomen. Tr. 144. The severity of the damage to Johnson's uterus, described as a "huge rupture," Tr. 230, required Dr. Javate to perform a hysterectomy, Tr. 144–45. Johnson's baby had died prior to its delivery. Tr. 253, 575–76. The cause of death was "intrauterine asphyxia due to uterine rupture due to placenta accrete." Exh. 4 at 413.

## CONCLUSIONS OF LAW[11]

The Court has jurisdiction pursuant to the FTCPA, 28 U.S.C. §§ 1346(b)

---

8. Dr. Javate wrote in his progress notes later that day, "I left the room & returned after a few minutes to [have] bp *immediately* done— it was noted to be 65/43." Exh. 1 at 71 (emphasis added). Johnson's counsel highlighted this note at trial because the word "immediately" appears to have been added to the notes after all of the other words had been written. Tr. 132–33. The Court agrees that the word was added to supplement Dr. Javate's original description of the events, which demonstrates Dr. Javate later reevaluated what he wrote. All of the words generally terminate at the end of the line whereas the word immediately begins at the end of the line and continues well into the margin. No other word in Dr. Javate's notes appears like this.

9. The nurses' notes indicate that Pitocin was stopped at 11:19 a.m. Exh. 1 at 146. Based on when and how information is entered into the nurses' notes and the computer, an overlap in times—making them appear inconsistent—can occur.

10. Johnson's vitals had not been taken since 9:30; yet, in a span of 3 minutes beginning at 11:16, a.m., they were taken three times. Exh. 1 at 146.

11. The section is entitled "Conclusions of Law," but the ultimate "question of whether a

and 2671 et seq., as Dr. Javate is "deemed" a federal employee for purposes of this case, *see* 42 U.S.C. § 233(g). The FTCPA provides in part: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages." 28 U.S.C. § 2674. It was "designed primarily to remove the sovereign immunity of the United States from suits in tort, and with certain specific exemptions, to render the Government liable in tort as a private individual would under the circumstances." *Richards v. United States*, 369 U.S. 1, 6, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962). Suits brought under the FTCPA are governed by "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). The conduct Johnson complains of occurred in the State of Illinois, so Illinois law applies to the claims.

## I. Legal Standards

[3, 4] Under Illinois law, a plaintiff must establish the following elements to prevail in a medical malpractice action: "(1) the standard of care in the medical community by which the physician's treatment was measured; (2) that the physician deviated from the standard of care; and (3) that a resulting injury was proximately caused by the deviation from the standard of care." *Neade v. Portes*, 193 Ill.2d 433, 250 Ill.Dec. 733, 739 N.E.2d 496, 502 (2000). "A plaintiff must present expert testimony to establish all three elements." *Wilbourn v. Cavalenes*, 398 Ill.App.3d 837,

338 Ill.Dec. 77, 923 N.E.2d 937, 949 (2010). The elements must each be proven by a preponderance of the evidence, "otherwise referred to as the 'more probably true than not true' standard." *Holton v. Mem'l Hosp.*, 176 Ill.2d 95, 223 Ill.Dec. 429, 679 N.E.2d 1202, 1207 (1997) (citing *Borowski v. Von Solbrig*, 60 Ill.2d 418, 328 N.E.2d 301, 305 (1975)).

## II. The Parties' Experts

Johnson retained two experts to satisfy her burden. The first expert, Mark Landon, M.D., is a medical doctor who specializes in obstetrics and gynecology. Tr. 520. He attended medical school at Cornell University Medical College and completed a residency and fellowship training at the University of Pennsylvania. Tr. 519–20. He later completed a fellowship in maternal-fetal medicine, which is a subspecialty of obstetrics and gynecology that involves high-risk or complicated pregnancies. Tr. 520. Dr. Landon is currently a professor and the chairman of the Department of Obstetrics and Gynecology at The Ohio State University College of Medicine. Tr. 521. He is an examiner for the American Board of Obstetrics in the maternal-fetal medicine division, Tr. 522–23, and has delivered thousands of babies in his career, Tr. 521. Furthermore, Dr. Landon is a "scientific reviewer" for various medical textbooks and journals, Tr. 523, and has published approximately 155 articles, some which specifically addressed uterine ruptures, Tr. 524.

[5] Johnson's second expert was Patricia Fedorka, R.N., Ph.D., a nurse who is certified by the National Certification Cor-

---

doctor deviated from the relevant standard of care necessarily involves questions of fact." *See Campbell v. United States*, 904 F.2d 1188, 1192 (7th Cir.1990); *accord Iseberg v. Gross*, 227 Ill.2d 78, 316 Ill.Dec. 211, 879 N.E.2d 278, 284 (2007) ("Whether a duty is owed is a question of law for the court to decide, while breach and proximate cause are factual matters for the jury."). Accordingly, many of the conclusions reached in this section involve both legal and factual determinations. The same applies to the question of compensation.

poration for obstetric, gynecological, and neonatal nursing specialties.[12] Tr. 350–51. She is a professor at the College of Nursing at Chamberlain College in Downers Grove, Illinois, where she was hired to help develop the Doctorate of Nursing Practice program for advanced-practice nurses—e.g., nurse midwives, nurse practitioners, and nurse anesthetists. Tr. 352. Dr. Fedorka has been involved in the delivery of approximately 1,500 to 2,000 babies throughout the course of her career. Tr. 355. As particularly relevant to this case, Dr. Fedorka has authored various publications on the subject of electronic fetal monitoring and been a speaker at various conferences concerning the topic. Tr. 355–56. She considers herself to be an expert in the field of reading and interpreting fetal monitoring strips. Tr. 357–58.

The Defense retained an expert in rebuttal, Julie Levitt, M.D. Tr. 714. Dr. Levitt is a medical doctor who attended medical school at Northwestern University in Chicago, Illinois. Tr. 714. She has been board-certified in obstetrics and gynecology since 2001. Tr. 715. Dr. Levitt is currently a member of the Women's Group of Northwestern, an eight-physician practice that specializes in gynecology and women's health issues. Tr. 715. She has a general practice, encompassing approximately 50% obstetrics and 50% gynecology. She also delivers babies, does

surgeries, and provides prenatal care and gynecologic services to women of all ages. Tr. 715. Dr. Levitt delivers approximately 150 to 170 babies a year and has delivered approximately 2000 to 2500 babies over the course of her career. Tr. 716. Approximately 5% to 10% of her patients have had either gestational diabetes or pregnancy-induced hypertension. Tr. 716. Dr. Levitt is also a clinical instructor at the Northwestern University Feinberg School of Medicine, where she teaches students and instructs them while undertaking various procedures including deliveries and surgeries. Tr. 717.

## III. Liability

### A. Standard of Care & Breach of Duty

 The standard of care in a medical malpractice case is "the relevant inquiry by which we judge a physician's actions." *Neade*, 250 Ill.Dec. 733, 739 N.E.2d at 502. The physician is "held to 'the reasonable skill which a physician in good standing in the community would use in a similar case.'" *Id.* (quoting *Newell v. Corres*, 125 Ill.App.3d 1087, 81 Ill.Dec. 283, 466 N.E.2d 1085, 1094 (1984)). In other words, the relevant consideration is the "degree of knowledge, skill, and care which a reasonably well-qualified physician in the same or similar community would bring to a similar

**12.** The Defense objected to any opinion offered by Nurse Fedorka regarding the applicable standard of care and causation. *See* R. 50. The Court overruled the objections at trial but allowed the Defense to raise the issue in its proposed findings of fact and conclusions of law by highlighting the particular testimony it finds objectionable. The Defense followed the Court's instructions and pointed to certain portions of Nurse Fedorka's testimony it argues should not be considered. R. 68 ¶¶ 161–77. The Court has reviewed the testimony the Defense finds objectionable and finds that the opinions are inadmissible because Nurse Fedorka is not a licensed physician, and therefore, she may not render opinions on the applicable standard of care for a physician or as to causation. *See Seef v. Ingalls Mem. Hosp.*, 311 Ill.App.3d 7, 243 Ill. Dec. 806, 724 N.E.2d 115, 125 (1999) ("Nurse Hall could not testify regarding proximate cause since she was not a medical expert."). As such, the Defense's motion, as renewed in its proposed findings of fact and conclusions of law, R. 50; R. 68, is granted. The Court has *not* considered any of the objectionable testimony in making its standard of care and proximate cause findings.

case under similar circumstances." *Purtill v. Hess*, 111 Ill.2d 229, 95 Ill.Dec. 305, 489 N.E.2d 867, 872 (1986). A breach occurs when a physician fails to use "reasonable skill" that "'physicians in good practice ordinarily use and would bring to a similar case.'" *Cummings v. Jha*, 394 Ill.App.3d 439, 333 Ill.Dec. 837, 915 N.E.2d 908, 920 (2009) (quoting *Pugh v. Swiontek*, 115 Ill.App.2d 26, 253 N.E.2d 3, 5 (1969)). This pertains to both making diagnoses and rendering treatment. *Id.*

Johnson contends that Dr. Javate breached the standard of care in four ways: (1) failed to adequately monitor Johnson's labor; (2) failed to promptly diagnose maternal abnormalities and fetal distress; (3) failed to call for and perform a timely cesarean section; and (4) ordered Pitocin subsequent to the onset of a uterine rupture. Because the breaches tend to overlap, the Court will address the first two sets of alleged breaches together and the third and fourth alleged breaches together.

### 1. Failure to Adequately Monitor Johnson's Labor & Failure to Promptly Diagnose Maternal Abnormalities and Fetal Distress

One of the underlying issues in this case is whether Johnson was a high-risk patient due to her gestational diabetes and hypertension. Dr. Landon opined that Johnson was a high-risk patient, Tr. 530; Dr. Levitt disagreed with that assessment, Tr. 725–26, 752–53. Dr. Levitt opined that a "high-risk patient" generally involves "something that is not in the realm of a general OB–GYN based on their training and preparation being able to handle," and the issues with Johnson were not of that nature. Tr. 726–28. The Court finds that Dr. Levitt's opinion is not credible. While there may be a more technical definition of the term, Tr. 727, Dr. Javate himself thought that Johnson was a high-risk patient, Tr. 70, 164. Johnson went to see Dr. Javate for a routine visit on February 8, 2008—two weeks before she was considered full term—and Dr. Javate told Johnson that she had to go to the hospital that day to be induced. Tr. 72. Dr. Javate may have told Johnson that she had time to pack first, but Johnson nevertheless went to the hospital within a relatively short time after a routine doctor's appointment. Tr. 631. That fact in and of itself indicates that Dr. Javate recognized that Johnson was at high risk and needed to begin labor almost immediately. It also diminishes Dr. Levitt's credibility throughout the case because she did not agree with a conclusion even the defendant doctor himself reached.

#### a. Failure to Visit Johnson

■ The fact Johnson was a high-risk patient is critical to the assessment of Dr. Javate's conduct in relation to what a reasonably-careful physician would do under like circumstances. It is, in essence, the foundation for Dr. Landon's opinion that the standard of care required Dr. Javate to visit Johnson when he arrived at the hospital after being summoned at 7:35 a.m., as well as numerous times before 11:00 a.m., Tr. 529–32. The Court finds this opinion credible. As to the issue of the breach of that standard of care, Dr. Javate demonstrated a seemingly-indifferent attitude towards Johnson's labor and delivery. To his credit, Dr. Javate told Johnson on February 8, 2008, to go to the hospital after a routine appointment, which indicates a level of concern for Johnson. Tr. 631. He also visited Johnson at the hospital at approximately 1:30 a.m. when Johnson was sleeping and not in labor. Tr. 188–89, 583; Exh. 1 at 142. However, when Dr. Javate returned the next morning at 8:00 a.m., he never returned to Johnson's room to check on her until at least 11:00 a.m. Tr. 78. Dr. Javate did

not check on Johnson despite the unrebutted testimony that he was summoned to the hospital by Nurse Wagner, Tr. 234; Exh. 1 at 144, and that Johnson asked to see him on at least three occasions, Tr. 337, 635, 793. Indeed, Christopher Burress, the baby's father, testified that he actually went to look for Dr. Javate himself after the nurse told him that Dr. Javate was doing rounds, though he was unsuccessful in his attempt. Tr. 670. Even Nurse Schwartz testified that on at least two occasions, between 8:30 a.m. and 9:00 a.m., she reminded Dr. Javate that Johnson wanted him to visit her. Tr. 278. Dr. Javate did not do so until 11:00 a.m., roughly 2 hours later. Tr. 78.

Dr. Levitt opined that the standard of care did not require Dr. Javate to visit Johnson upon arriving at the hospital, Tr. 739, but this opinion is not credible for two main reasons. First, the Court has concluded that Johnson was a high-risk patient, which obviously should put a physician on high alert for problems during the delivery. Tr. 530–32. Because the Court has not credited Dr. Levitt's opinion that Johnson was not a high-risk patient, her opinion that the standard of care did not require Dr. Javate to visit Johnson on various occasions throughout the morning of February 9, 2008, is also not credible. Second, Dr. Levitt testified that the nurse requesting Dr. Javate's presence at the hospital did not explicitly note that Dr. Javate needed to visit *the patient*. This opinion was based on Dr. Levitt's assessment of the nurses' note that said "Presence Requested," as opposed to "Presence Requested to the Bedside." Tr. 739–40. This differentiation is not persuasive. If a patient is in labor and a doctor is requested to come to the hospital, there must be a particular reason for that summons, and the doctor should at a minimum see for himself how the patient is doing. As Dr. Landon testified to this obvious and unre-

markable point, "[A]s a general principle, if the physician is in the hospital and they're being summoned by the nursing staff to see the patient, they should come and see the patient." Tr. 532. The nurse should not have to specify where exactly the doctor should go once he arrives at the hospital. Put simply, it makes no sense in this situation (where the mother in labor was a high-risk patient) that the note would simply mean "be 'in the facility,' " as Dr. Levitt testified, Tr. 739.

The Defense further contends that Johnson just wanted "to say hi" to Dr. Javate, Tr. 337, so there was no particular reason for Dr. Javate to visit Johnson. That contention is irrelevant in light of all the *other* information presented to Dr. Javate. Tr. 532–33. For instance, Johnson repeatedly asked to see Dr. Javate, and a patient oftentimes can provide more information about how she is feeling than other means, such as the external monitors. Tr. 801. The repeated requests for Dr. Javate, and Burress's corresponding attempts to find him, should have demonstrated more was going on than a simple request to say "hi." Additionally, the uncontroverted testimony was that a patient in active labor (meaning the patient is dilated from 3 to 4 centimeters, Tr. 478) takes priority over other patients, Tr. 7879, 799, and Johnson was Dr. Javate's only patient in active labor on the morning of February 9, 2008, Tr. 78, 263, 323, 533.

Dr. Javate testified that he was visiting other postpartum patients and conducting rounds throughout the morning, Tr. 78, but that testimony does not adequately explain why he did not visit Johnson when he arrived at the hospital or waited until 11:00 a.m. to go into Johnson's room. In fact, there is no good explanation for what Dr. Javate was doing for 3 hours that could have taken priority over at least visiting Johnson upon her repeated re-

quests. Even Dr. Levitt conceded that "it's [their] custom and practice to appease the patient and to reassure them and to do what [they] can, time permitting and situation permitting, to visit." Tr. 798. There are no facts in this case that would demonstrate Dr. Javate was prevented from visiting and checking on Johnson, a *high-risk patient*, when he arrived at the hospital until he first saw Johnson at 11:00 a.m. There is also nothing demonstrating that Dr. Javate was so busy dealing with postpartum patients in such a way that he did not have the time to visit the one patient whom he should have been affording the greatest priority. Tr. 209. Even Dr. Javate testified that there was not an emergency or anything out of the ordinary that would have prevented him from going to Johnson's room. Tr. 209.

The Court finds that the standard of care required Dr. Javate to check in and visit Johnson before 11:00 a.m., Tr. 590–91—and more than likely, "shortly after [Dr. Javate's] arrival" at the hospital, Tr. 547. Dr. Javate failed to do that, which is a breach of the applicable standard of care. This inexplicable failure began a cascade of missed opportunities that ultimately resulted in the death of Johnson's baby.

### b. Failure to Insert Internal Monitoring Devices

If Dr. Javate had visited Johnson at approximately at 8:00 a.m. when he arrived at the hospital, the standard of care would have required him to observe the fetal monitoring strips and the uterine contraction readings and to conclude they were *not* reassuring.[13] Both Dr. Landon and Dr. Fedorka testified that the strips themselves revealed non-reassuring information about the status of the baby between 7:00

a.m. and 9:00 a.m. Tr. 380–88, 392–93, 534. There were documented late decelerations between 7:00 a.m. and 7:40 a.m. and ambiguous tracings beginning at 7:40 a.m. Tr. 557–58. That testimony is in conflict with Dr. Levitt's testimony that the information on the strips was reassuring. Tr. 765. Nevertheless, the Court again finds Dr. Landon and Dr. Fedorka's opinions on this subject to be more credible than those of Dr. Levitt. Dr. Levitt is a more recent medical school graduate who is more active in the clinical setting at this point in her career. However, Dr. Landon also has an extensive breadth of experience and has been involved with the publication of numerous articles, some which specifically dealt with the issue of uterine ruptures. Tr. 524. Conversely, Dr. Levitt only has one article her to credit—an article that she was not the primary author on—and it was not in the field of uterine rupture. Tr. 785. This does not undermine Dr. Levitt's qualifications as an opinion witness. Both Dr. Landon and Dr. Levitt were impressive and being more published by itself does not necessarily make one opinion witness more credible than another. But in the end, Dr. Landon's remarkable background, both in the academic and clinical settings, along with his clear and straightforward answers to cross-examination questions and the non-combative manner in which he answered them, makes him the more credible witness. This credibility determination is bolstered by Dr. Fedorka, an experienced nurse who is an expert in the reading of monitoring strips, whose testimony was consistent with Dr. Landon's. It is also bolstered by the fact that Dr. Levitt, who is familiar with Dr. Landon's work because of his prominence in

---

13. There was testimony that Dr. Javate could have viewed the fetal monitoring strips from the nurses' station in order to determine the status of the baby. Tr. 289. However, there was no clear-cut testimony that Dr. Javate ever carefully reviewed the monitor at the nurses' station, despite having the opportunity to do so. Tr. 10507.

the field, commented that Dr. Landon is "generally respected amongst his peers." Tr. 850–51.

Thus, if Dr. Javate had simply gone into Johnson's room at 8:00 a.m., he would have seen the non-reassuring or ambiguous patterns and taken steps to alleviate the uncertainty—e.g., inserting an intrauterine contraction monitor or applying a fetal scalp monitor. Had he not done so, he would have failed to meet the standard of care by not recognizing them as non-reassuring. It is not possible to know what *would* have occurred here, however, because Dr. Javate never even went into the room. At the very least, if the strips showed ambiguous information (as opposed to non-reassuring information), Dr. Javate could have confirmed the health status of the baby by inserting the internal monitoring devices. Tr. 546, 554–55. Dr. Landon and Dr. Fedorka testified that they are easy to insert, do not pose any unreasonable risks to the mother or the baby, and give accurate readings. Tr. 36468, 554–55. Dr. Landon further testified that inserting the internal monitoring devices is the proper procedure when a physician is presented with non-reassuring patterns on the strips in order to accurately assess the status of the baby. Tr. 546, 554–55. Dr. Levitt agreed that using a fetal scalp electrode can resolve the question of whether the external monitor is recording the mother's heart rate or the baby's. Tr. 812–13. Dr. Levitt also agreed that many nurses, including Nurse Schwartz, are trained to apply the internal fetal scalp electrode. Tr. 772. Here, Dr. Javate failed to utilize any internal monitoring devices and, thus, also failed to adequately monitor the status of the baby.

The same analysis applies to what occurred at 9:30 a.m. when Johnson's pulse was finally recorded at 146 bpm—an hour too late according to hospital policy, Tr.

461, 804–05—and the fetal heart rate was in that range. The standard of care required Dr. Javate to investigate whether the readings were of Johnson's heart rate or her baby's. Tr. 364–65, 554–55. The first step would have been repeating the vitals every 15 minutes or so to "monitor the stability of the situation." Tr. 555, 765. That obviously did not occur. And then, if the monitor continued to give a reading for Johnson's heart rate that was more consistent with a normal fetal heart rate (between 110 and 160 bpm), the standard of care would have required Dr. Javate to put an internal scalp electrode on the baby to confirm whose pulse was being recorded. Tr. 555–56. Dr. Javate did not do that, which was also a breach of the standard of care.

### c. Failure to Investigate the Bloody Shows

Dr. Javate was informed of a "good bloody show" at approximately 8:30 a.m. Tr. 270; Exh. 1 at 145. Dr. Landon testified that the standard of care required Dr. Javate to evaluate the bleeding and look at Johnson's vital signs. Tr. 547–49. This opinion was grounded in his belief that it is "fairly uncommon" to have that type of bleeding, or at least bleeding described as a bloody show, "at that point in labor" with Johnson being 6 centimeters dilated. Tr. 548. Conversely, Dr. Levitt testified that the standard of care did not require Dr. Javate to personally evaluate Johnson after learning of the first bloody show. Tr. 747–48. Dr. Levitt further testified that the standard of care did not require Dr. Javate to ask for Johnson's vitals after Nurse Schwartz reported a bloody show. Tr. 753.

While the Court again credits Dr. Levitt as a qualified opinion witness, Dr. Landon's background and extensive experience, along with his manner of testifying, renders his opinion more credible. Dr.

Levitt's manner of testifying came across as defensive in that she was would not concede any point that was in any way inconsistent with her overall conclusion, even when the point appeared obvious and could have been conceded without doing damage to her overall opinions. For example, she would not concede that the uterine rupture must have been occurring by 11:04 a.m., Tr. 819, which both Dr. Javate and Dr. Landon both believed, Tr. 145–46, 568. Additionally, as previously discussed, Dr. Levitt did not believe Johnson was a high-risk patient despite Dr. Javate and Dr. Landon concluding otherwise. Dr. Levitt replied, "Ideally, yes," when asked whether "[she] as the doctor [has] the responsibility to do everything [she] reasonably can to deliver a healthy baby." Tr. 838. Yet taken together, her testimony regarding the bloody show implied that all Dr. Javate was required to do was rely on the nurses' conclusions (e.g., that the vitals were "okay" without knowing exactly what they were, Tr. 758), and that Dr. Javate did not have his own duty to seek out the information that would warrant a particular conclusion unless the nurse asked *him* to do something. Tr. 752, 796–97, 837. The Court finds Dr. Levitt's opinion regarding what Dr. Javate had to do when learning of the bloody show to be not credible.

Furthermore, Dr. Levitt testified that there would have been more bleeding if there was a problem requiring Dr. Javate's presence, and the nurse would have alerted him to the amount. Tr. 754. Despite that, however, Dr. Levitt admitted the possibility that there could have been more

significant bleeding into Johnson's abdomen or that the baby's head, which at the time was at +1 station, may have been acting as a form of a "cork" or blockage preventing more blood from reaching the pad. Tr. 600, 737, 760. That concession substantially weakens her argument that the bloody shows could only have been routine events during the course of a mother's delivery.[14] Additionally, Dr. Levitt made several mistakes in her assumptions about testimony that undermine the credibility of her opinions. In particular, Dr. Levitt was of the opinion that the vitals of a patient were to be taken every two hours, when in fact, St. James Hospital requires them to be taken at least every hour. Tr. 803–04. This important mistake cuts directly against many of her conclusions because it demonstrates that Dr. Javate *did not* have "current vital signs" throughout much of the morning, Tr. 804–05—especially when it mattered, such as when determining the significance of the bloody shows and evaluating Johnson when the baby receded to a −3 station.

In recognizing that the standard of care required Dr. Javate to act when he learned that Johnson had a bloody show, the Court notes that Dr. Javate was at the nurses' station when he received the information, which is only a few feet away from Johnson's room. Tr. 79. Although a bloody show is generally a "relatively common" occurrence during active labor, Tr. 81–82, Johnson was a high-risk patient with a risk of placental abruption, so internal bleeding (and necessarily, a uterine rupture or placental abruption) should have been on his differential diagnosis.[15] Tr. 548, 553, 807,

---

14. The Court cannot conclude from the testimony that the bloody shows *were* related to the subsequent uterine rupture and placental abruption. Nevertheless, the fact they occurred should have put Dr. Javate on notice that something *might* be awry.

15. A differential diagnosis in the medical arena is an analysis and prioritization of what diagnoses could be causing the patient's symptoms. *See generally Wilkerson v. Cnty. of Cook*, 379 Ill.App.3d 838, 318 Ill.Dec. 840, 884 N.E.2d 808 (2008) ("In *Mills*, the defendant physician diagnosed the decedent child

836. Dr. Javate even testified that the first thing a physician should rule out when presented with bleeding is a placental abruption. Tr. 82. Yet, Dr. Javate did not examine the pad or the blood. He did not conduct a vaginal exam or ask Johnson how she was doing. Tr. 82. Although Dr. Javate was a few steps from Johnson's room, he failed to even enter the room or take any simple investigative steps after learning of the bloody show. Tr. 82.

Dr. Javate testified that he was not required to do anything because Nurse Schwartz assumed that there was nothing wrong with the bleeding (even though she felt the need to notify him about it), and "the rest of the maternal status and the fetal status was perfectly fine." Tr. 82, 86–87; *see* Tr. 327. But there is no evidence Dr. Javate even knew what the vitals were. It is illogical for Dr. Javate to testify that the maternal and fetal statuses were fine when he was unaware of the information that would justify such a conclusion. That is true even if a physician can generally rely on a nurse to report complete and accurate information. Tr. 74849. Dr. Javate testified that a physician must consider "the whole clinical picture," Tr. 84, yet he was unaware of even the most basic information (i.e., the vitals) that he had a duty to know, Tr. 553. This stark detail is highlighted by the fact that the vitals had not been taken since 7:30 a.m., an hour before, when Dr. Javate learned of the first bloody show at 8:30 a.m. Tr. 83.

Dr. Javate's failure to monitor Johnson's labor and delivery is even more apparent when the information concerning Johnson's second bloody show is considered. At approximately 9:00 a.m., Dr. Javate was

notified of a "*large* bloody show" and that Johnson was 8 centimeters dilated approximately 25 minutes earlier at 8:34 a.m. Tr. 211, 277, 552; Exh. 1 at 145. Dr. Landon testified that "having frank bleeding when [a patient is] beyond 6 centimeters, let alone 8 centimeters, is not a common event and should always raise a question as to whether this is something more than just bleeding from cervical dilation." Tr. 55051. Based on that, Dr. Landon further testified that even if Dr. Javate had been told Johnson was progressing well, Dr. Javate was still required to evaluate the patient himself at that point. Tr. 551–52. Again, however, Dr. Javate did not enter Johnson's room, ask Johnson how she was doing, examine the bloody show, or learn of Johnson's vitals or request that they be taken. Tr. 90–92. In Dr. Javate's own words, he just "ruled [internal bleeding and placental abruption] out in [his] head at that time." Tr. 93. Had Dr. Javate done the minimal work of simply walking into Johnson's room, he could have observed whether this *second* bloody show in less than an hour, one that was classified as being *large*, indicated that something troubling was occurring or could occur.

If Dr. Javate had entered the room after learning of the bloody shows at 8:30 a.m. and 9:00 a.m., the standard of care would have been to ask for the vitals and, if they had not been taken (as the Court finds is the case), to request the attending nurse to take them. Tr. 553. The undisputed testimony is that Nurse Schwartz would have been required to take Johnson's vitals if Dr. Javate requested them. Tr. 267. It is thus clear that Dr. Javate violated the standard of care because he did not enter the room at either 8:30 a.m. or 9:00 a.m.

with an upper respiratory infection and also made a 'differential diagnosis' of pneumonia, meaning the physician considered pneumonia to be a contributing cause of the child's symp-

toms." (citing *Mills v. Cnty. of Cook*, 338 Ill.App.3d 219, 272 Ill.Dec. 865, 788 N.E.2d 169, 170 (2003))).

The earlier discussion regarding the standard of care and inserting the internal monitoring devices applies equally to when Dr. Javate should have entered the room after learning of the bloody shows as well.

Furthermore, as Dr. Javate conceded, the standard of care required him to rule out the worst possible medical situation before assuming everything was normal. Tr. 88. Dr. Levitt conceded as much on cross examination. Tr. 807. Even so, Dr. Javate just *assumed* that the second bloody show was "probably just part of [Johnson's] labor." Tr. 88. That thought process is exactly backwards. When conducting a differential diagnosis, a doctor should *not* assume that the most benign cause is the most likely scenario. Instead, a doctor needs to factually eliminate the worst causes before assuming the least dire or risky situation is occurring. Dr. Javate's incorrect and uninformed assumption, combined with Dr. Javate's failure to take any steps to rule out a placental abruption or uterine rupture during Johnson's delivery when learning of the bloody shows—the first differential diagnosis he should have ruled out, Tr. 90—was also a breach of the standard of care.

### 2. Failure to Call for and Perform a Timely C–Section & Ordering Pitocin

Johnson contends that the standard of care required Dr. Javate to immediately call for a C-section when learning that the baby had receded up the vaginal canal from a +1 station to a −3 station. Dr. Landon's testimony on this point was absolutely clear and unequivocal: "[T]he diagnosis if you're going from +1, to +2 to −3, the differential diagnosis would go like this: Number one, uterine rupture. Number two, uterine rupture. Number three, uterine rupture." Tr. 564. Dr. Landon opined that a uterine rupture was the only explanation for what could have occurred,

and the standard of care required Dr. Javate to immediately call for a C-section. Tr. 564–65. Dr. Levitt disputed that contention, testifying that the baby could have just been rolling around or repositioning itself, so Dr. Javate was not required to immediately call for a C-section. Tr. 775–77.

The Court finds Dr. Levitt's explanation neither logical nor credible when considered in light of Dr. Landon's testimony that the change in station could only be caused by a uterine rupture. Dr. Landon has extensively published on the issue, and even though a uterine rupture is itself rare—and even more rare in a patient who has not previously undergone a C-section, Tr. 597—the fact Dr. Landon has made this area a focus of his academic interests means that his experience on the topic far exceeds that of Dr. Levitt. Moreover, although Dr. Levitt said she had encountered the same situation a week or so prior to her testimony and did not immediately call for a C-section during that delivery, Tr. 777, the Court does not find credible Dr. Levitt's description of that situation as being equivalent to what occurred here, which Dr. Landon unequivocally stated was a sign of a uterine rupture, Tr. 600.

Accordingly, the Court finds credible Dr. Landon's opinion that a baby receding from a +1 station to −3 station is such a rare occurrence that "the bells should [have been] going off" that something was wrong and that a C-section was necessary. Tr. 565–67. Nurse Schwartz noted on a prior occasion that the baby's head was "deeply wedged" in Johnson's vagina, Tr. 413, so it *must* have been a traumatic event that caused the baby to recede in such an extreme matter because, as Dr. Landon opined, this was a "very unusual circumstance and should not happen." Tr. 573–74. Dr. Landon testified that taking Johnson's vitals at that time while prepar-

ing her for a C-section would have satisfied the standard of care. Tr. 566–67. However, Dr. Javate did not even request that Johnson's vitals be taken until approximately 10 minutes later, Tr. 604, instead ordering that Johnson be given Pitocin and leaving the room, Tr. 129–32. This situation appears to have been something Dr. Javate had never seen before. It likewise may be extremely rare for a uterine rupture to occur in a woman who had not previously had a C-section. Tr. 222. That does not, however, excuse Dr. Javate from simply ordering Pitocin and waiting 15 minutes until 11:19 a.m. to bring Johnson to the operating room. In an emergency situation, time is of the essence and minutes matter, especially when it comes to an emergency C-section. Tr. 835. Tragically, it certainly mattered in this case.

The Defense contends that Dr. Javate acted reasonably by evaluating Johnson and performing a vaginal exam when learning that the baby had receded. The Court agrees that Dr. Javate acted reasonably in verifying the information Nurse Schwartz communicated to him by conducting a vaginal exam at roughly 11:04 a.m. It was his conduct following his examination that results in another breach of the standard of care: taking too much time to figure out what had occurred, waiting at least 10 minutes to order Johnson's vital signs, and failing to immediately order a C-section after confirming the baby receded to a −3 station from a +1 station. Tr. 571–74. When presented with a situation that Dr. Landon described as having "no real other good explanation," Tr. 608, Dr. Javate should have immediately ordered a C-section, Tr. 605–06, 621. No additional time at that point should have been lost. Dr. Javate's failure to timely order a C-section at 11:04 a.m. and his decision to, instead, order Pitocin were violations of the applicable standard of care. Tr. 571.

**B. Causation**

 "Proximate cause [in a medical malpractice] case must be established by expert testimony to a reasonable degree of medical certainty. Any causal connection between treatment, or a delay in treatment, and the claimed injury 'must not be contingent, speculative, or merely possible.' " *Walton v. Dirkes,* 388 Ill.App.3d 58, 327 Ill.Dec. 921, 903 N.E.2d 18, 20 (2009) (quoting *Aguilera v. Mount Sinai Hosp. Med. Ctr.,* 293 Ill.App.3d 967, 229 Ill.Dec. 65, 691 N.E.2d 1, 7 (1997)) (internal citations omitted). The Illinois Pattern Jury Instructions define proximate cause as "[any] cause that, in the natural or ordinary course of events, produced the plaintiff's injury. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it combines with another cause resulting in the injury.]" Illinois Pattern Jury Instructions, Civil, No. 15.01 (2009) (second set of brackets in original). In short, the plaintiff must establish both that: "(1) the defendant 'deviated from the standard of care[,]' and (2) 'that *that deviation* was [a] proximate cause of the plaintiff's injury.' " *Buck v. Charletta,* 373 Ill. Dec. 576, 994 N.E.2d 61, 72 (2013) (quoting *Snelson v. Kamm,* 204 Ill.2d 1, 272 Ill.Dec. 610, 787 N.E.2d 796, 821 (2003)). This can be done by presenting " '[e]vidence which shows to a reasonable [degree of medical] certainty that negligent delay in diagnosis or treatment ... lessened the effectiveness of treatment[.]" *N. Trust Co. v. Louis A. Weiss Mem'l Hosp.,* 143 Ill. App.3d 479, 97 Ill.Dec. 524, 493 N.E.2d 6, 12 (1986) (quoting *James v. United States,* 483 F.Supp. 581, 585 (N.D.Cal.1980)). "[T]he plaintiff exclusively bears the burden of proof to establish the element of causation ... and ... a defendant has the right to rebut such evidence and to also establish that the conduct of another caus-

ative factor is the *sole* proximate cause of the injury." *Ready v. United/Goedecke Servs., Inc.*, 238 Ill.2d 582, 345 Ill.Dec. 574, 939 N.E.2d 417, 422 (2010) (quoting *Nolan v. Weil–McLain*, 233 Ill.2d 416, 331 Ill. Dec. 140, 910 N.E.2d 549, 563 n. 4 (2009)) (internal quotation marks omitted) (emphasis added).

▬▬ The Court has identified numerous breaches of the standard of care. These include failing to see the patient when requested, failing to recognize non-reassuring fetal strip results, failing to evaluate Johnson or learn of her vitals after learning of the first and second bloody shows, and failing to act in a timely fashion when learning that the baby had receded to a −3 station at 11:04 a.m. The difficulty is determining whether any of these breaches actually *caused* the harm to Johnson's baby. The reason for this is none of the experts were able to opine exactly when Johnson's uterine rupture occurred. Tr. 593–94, 818–19. Additionally, on cross examination, Dr. Landon conceded that none of the breaches before 10:08 a.m. were the proximate cause of Johnson's baby's death. Tr. 593. The Court credits the uncontroverted testimony that the uterus was more than likely intact at 10:08 a.m. Nevertheless, certain other facts allow for a finding of proximate cause based on the totality of the breaches of the standard of care for which Dr. Javate was responsible.

The Defense argues that Dr. Landon could not testify to a reasonable degree of medical certainty that the two bloody shows were related to the uterine rupture, so Johnson cannot prove that failing to evaluate them proximately caused the baby's death here. R. 68 ¶ 213; *see* Tr. 593–94. But that ignores the totality of the medical situation. It was Dr. Javate's initial failures to visit Johnson, learn of and evaluate her vital signs, and insert the internal monitoring devices that led to the *later* failures that caused the baby's death. Tr. 593. In Dr. Landon's words, which the Court finds credible, "[the initial breaches of the standard of care] set into motion a series events that allowed harm to occur after that period of time," i.e., after 10:08 a.m. Tr. 593. In essence, for at least the last hour of Johnson's delivery, Dr. Javate was operating without sufficient information to make accurate and informed decisions. Dr. Javate should have been adequately monitoring the baby and the mother with internal monitors after 10:08 a.m. but prior to 11:04 a.m. He should have been doing this in light of the information previously discussed, including the two bloody shows and the non-reassuring or ambiguous fetal monitoring strips. He should have inserted the internal monitors, which would have shown late decelerations indicating that the baby was not receiving sufficient oxygen at that time. Tr. 557–58, 598. There would have been no confusion as to whether the external monitor was recording Johnson's heart rate or her baby's. The Court finds credible Dr. Landon's testimony that Dr. Javate would have then "seen a progressive deterioration in fetal status, evidenced by either significant decelerations from umbilical cord compression and/or late decelerations from hypoxia or prolonged decelerations from cord compression and hypoxia, which would have morphed eventually into a frank fetal bradycardia when the baby wasn't getting any more blood flow[.]" Tr. 558. Knowing that information would have alerted a reasonably careful physician to order a C-section at that time, thus allowing for a prompt and life-saving procedure. Dr. Javate was essentially operating in the blind. He had the capability of getting the information any reasonably-careful physician would need—but he did not.

That conclusion is supported by the major fact that likewise supports a determination that a failure to order an emergency C-section at 11:04 a.m. and promptly take Johnson to surgery also proximately caused the baby's death. At 11:04 a.m., the baby was still in the uterus at a −3 station, and it is more likely true than not that there was still blood circulation between Johnson and the baby. Tr. 568, 625. According to Dr. Landon, if there was still circulation between Johnson and her baby, the baby would have been alive at that point. Tr. 568. The Court finds this opinion credible.

Dr. Levitt testified that the uterine rupture did not necessarily occur prior to 11:16 a.m., Tr. 828, and that the baby was alive at least until 11:22 a.m., Tr. 854–55. The Defense argues that this information, if true, demonstrates that any failure to install internal monitoring devices to record the baby's status and to call for a C-section at 11:04 a.m. (or earlier) could not have been a proximate cause of the baby's death. Again, it is unclear as to when exactly the uterine rupture occurred because both doctors testified that uterine rupture is typically accompanied by a tremendous amount of pain in the patient. Tr. 607–08, 781–82. From the record and the testimony at trial, it appears there was no particular period of time during the morning of February 9, 2008, when Johnson claimed to have extreme pain. There is no logical explanation for this, especially considering Johnson did not have an epidural—an injection that provides pain relief during labor. Tr. 634, 781–82. Neither Dr. Landon nor Dr. Levitt could explain this anomaly. It is possible that Johnson simply had a significant pain tolerance. But either way, as Dr. Landon testified, the diagnosis of a uterine rupture is generally made on the basis of "deterioration of fetal status[, which] was something that could have fairly easily been made had there been proper monitoring of the fetus, regardless of the cause being a fairly uncommon or rare event[.]" Tr. 608. Making a specific finding as to when exactly the rupture occurred is unnecessary to the ultimate conclusion. The only finding the Court makes as to when exactly the rupture occurred is that it must have occurred prior to 11:16 a.m., otherwise Johnson's blood pressure readings would not have been so extremely low when taken at that time. Tr. 565–66, 622.

The more pertinent issue is Dr. Levitt's testimony that the baby was alive and had a normal heartbeat at least until 11:22 a.m. Tr. 854. If that was the case, surely a C-section that should have been performed at 11:04 a.m. would have allowed the baby to survive. This is true given the fact a C-section could have been performed then. There was no evidence that the procedure could not have been performed at that time, or any time before 11:33 a.m., due to some other circumstance. Nevertheless, it is unquestioned that the baby was dead when it was removed from Johnson's abdomen at 11:33 a.m. Tr. 562; Exh. 4. Based on Dr. Landon's testimony, which the Court again finds credible, if there was a "stable" fetal heartbeat when Johnson was disconnected from the monitors at the moment before the C-section was performed (at 11:22 a.m.), the baby would have been alive when retrieved in the abdomen (at 11:33 a.m.). Tr. 562, 575–76. The baby may have been disabled, but at the very least, she would have been alive. Tr. 576. Dr. Levitt's testimony that the baby could have fully bled out in 13 to 14 minutes (between 11:19 a.m. and 11:33 a.m.) and that the baby could have been "unresuscitatable" at 11:33 a.m., Tr. 856—which is in direct contrast to Dr. Landon's testimony, Tr. 562—is thus not credible.[16]

Based on the testimony of Dr. Landon, the Court finds that it was the mother's heartbeat that was actually being recorded at 11:22 a.m., not the baby's. Tr. 562, 575–76. That is why the strips did not clearly show fetal distress and why the exact status of the baby during this time period is not abundantly clear. It is also why Dr. Javate's testimony that the reassuring strips (at least in his opinion) were "confusing the whole picture" at 11:04 a.m., Tr. 135–36, does not merit any weight. If Dr. Javate had taken steps earlier to rectify any confusion by inserting the internal monitors, the "picture" at that time would not have provided confusing results. In any event, the more important finding is that Dr. Javate ordering a C-section at 11:04 a.m., 4 minutes after it is *known* the baby was still alive, would have more than likely saved the baby. Therefore, the failure to perform a timely C-section and, again, the failure to adequately monitor the baby, were most certainly proximate causes of the baby's death.

There·was considerable testimony at trial regarding (1) how long it takes Pitocin to affect a woman's uterine contractions, Tr. 474, 572–73, 782–83; (2) when Nurse Schwartz actually started and stopped the Pitocin, Tr. 336, 342, 488–89; and (3) whether Johnson actually received Pitocin, Tr. 336, 482, 572, 782. On the whole, however, the evidence is ambiguous as to whether the Pitocin had any effect on the delivery. So, given the time it was ordered, in conjunction with the amount of time required for it to have an effect on the patient, the Court does not find it more probable than not that the Pitocin actually exacerbated the situation here. Nonetheless, the administration of Pitocin contributed to the delay in immediately having Johnson taken to the emergency room for a C-section after the baby receded to a −3 station shortly after 11:00 a.m. In that regard, the ordering of Pitocin—but not the effect of the drug—did contribute to the delay and thus was a proximate cause of the baby's death.

To the extent the Defense argues that it was *solely* Nurse Schwartz's acts or omissions that led to Johnson's baby's death, that contention is unavailing. The Court agrees that Nurse Schwartz was negligent in her treatment of Johnson, including failing to take Johnson's vitals and failing to relay complete and accurate information to Dr. Javate. Tr. 448, 451. Such a finding, however, does not absolve Dr. Javate of liability. Dr. Javate is the one who was ultimately responsible for the health and safety of Johnson and her baby. Tr. 533, 837. If Nurse Schwartz did not provide him with complete and accurate information, he had a duty to learn of the information himself. As described above, if Dr. Javate had taken control of the situation and abided by the standard of care required of him, it is more than likely that any shortcomings of Nurse Schwartz would have been overcome. Dr. Javate's failure to render care as a reasonably careful physician would under the circumstances was at least a contributing cause of Johnson's baby's death, if not the primary cause. That is sufficient under Illinois law to satisfy the proximate cause element. *See Jones v. Beck*, 2014 IL App (1st) 131124, at ¶¶ 28–29, 384 Ill.Dec. 193, 16

---

**16.** Dr. Levitt testified as follows:
> If the baby bled out through the placenta and the uterus during the rupture, even with the placenta attached but leaking out the back of the uterus, that blood supply and that blood pressure was not sustained and the baby had no circulating blood volume, you have no blood and circulation to work with. So in those instances, death is quick, and the baby is unresuscitatable.
> Tr. 856.

N.E.3d 289 (2014); *Cetera v. DiFilippo*, 404 Ill.App.3d 20, 343 Ill.Dec. 182, 934 N.E.2d 506, 525–28 (2010).

## III. Compensation Award

 Illinois law allows for the recovery of loss of society "where [a] nearly full-term child dies before birth." *Seef v. Sutkus*, 145 Ill.2d 336, 164 Ill.Dec. 594, 583 N.E.2d 510, 512 (1991). Having determined that Dr. Javate's breaches of the standard of care proximately caused Johnson's baby's death, the Court must determine the amount of compensation to award. In all wrongful death actions under Illinois law, "the jury may give such damages as they shall deem a fair and just compensation with reference to the pecuniary injuries resulting from such death, including damages for grief, sorrow, and mental suffering, to the surviving spouse and next of kin of such deceased person." 740 Ill. Comp. Stat. 180/2. Nakia's surviving next of kin—and those who are eligible to recover for their loss—are her parents, Johnson and Burress; her sisters TaKayla Toles and Lisa Burress; and her brothers Christopher Burress, Jr., Reginald Walton, Jr., Jakobee Walton, and Tyler French. *See In re Estate of Poole*, 207 Ill.2d 393, 278 Ill.Dec. 532, 799 N.E.2d 250, 255 n. 3 (2003) (" 'Next of kin' are those blood relatives of the decedent who are in existence at the time of the decedent's death who take the decedent's property if the decedent had died intestate."). TaKayla, Reginald, and Jakobee are Johnson's children, and they all live with her. Tr. 505. Lisa, Christopher, and Tyler are Burress' children; they do not live with Johnson or Burress. Tr. 661, 679–80, 685. Johnson and Burress are no longer in a relationship and do not live together. Tr. 505, 661, 679.

Federal Rule of Civil Procedure 52(a) "requires judges, when they are the triers of fact, to make written findings in support of their conclusions," *Jutzi–Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001), sufficient to comply with Rule 52(a)'s "duty of reasoned, articulate adjudication," *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir.2008). "This means, when the issue is the amount of damages, that the judge must indicate the reasoning process that connects the evidence to the conclusion." *Jutzi–Johnson*, 263 F.3d at 758. Furthermore, in assessing the losses sustained, the Court must consider how long Nakia's next of kin will be likely to sustain pecuniary losses as a result of her death, considering how long Nakia was likely to have lived and how long her next of kin are likely to live. *See* Illinois Pattern Jury Instruction, Civil, 31.13 (2012).

 A plaintiff has the burden of proving the amount of compensation with reasonable certainty. *Arroyo v. United States*, No. 07 C 4912, 2010 WL 1437925, at *9 (N.D.Ill. Apr. 2, 2010), *aff'd* 656 F.3d 663 (2011). Johnson's counsel provided the Court with the United States Mortality Table to demonstrate Nakia's life expectancy, as well as the remaining life expectancies of her next of kin. Exh. 25. The remaining life expectancy of each is as follows: Nakia (80.4 years); Jocelyn Johnson (50 years); Christopher Burress (47.6 years); TaKayla Toles (70.6 years); Reginald Walton (69.5 years); Jakobee Walton (70.5 years); Lisa Burress (72.5 years); Chris Burress, Jr. (66.6 years); and Tyler French (69 years). *See* R. 67 ¶ 84 (citing Exh. 25). At trial, Johnson, Burress, and TaKayla testified regarding their emotional state since Nakia's death, the relationship they hoped to have with Nakia (discussed further below); and how Nakia's death has affected them. In light of that testimony, Johnson's counsel requested the Court to award the following amounts for

the total pecuniary loss by Nakia's next of kin:

| | |
|---|---|
| Jocelyn Johnson: | $1,000,000 |
| Christopher Burress: | $500,000 |
| TaKayla Toles: | $250,000 |
| Reginald Walton, Jr.: | $250,000 |
| Jakobee Walton: | $250,000 |
| Christopher Burress, Jr.: | $100,000 |
| Lisa Burress: | $100,000 |
| Tyler French: | $100,000 |
| **Total:** | **$2,550,000** |

## A. Comparison to Analogous Cases

■■■ The Seventh Circuit has explained that "judge[s] should ... consider[ ] awards in similar cases, both in Illinois and elsewhere." *Arpin*, 521 F.3d at 776. Accordingly, the parties submitted the compensation awards in other cases from the past ten years to support what they believe would be a fair compensation award in this case. The Defense directs the Court to consider three cases. R. 68 ¶¶ 222–24. Each of the cases involved jury verdict awards for the death of a baby:

| Award | Case Name |
|---|---|

- $350,000: *Thigpen v. Bray*, 2012 WL 3195238, Cook County, IL, Case No. 08 L 11111

- $1,100,000: *Harris v. Reid Hospital & Health Care Services*, 2010 WL 4020549, Wayne County, Ind., Case No. 89C01-0301-CT-001
- $450,000: *Valdovinos v. Sauer*, 2006 WL 4591458, Will County, IL, Case No. 02 L 202

*See id.* Johnson submitted thirty-one cases to the Court that included both settlements and verdicts from the Cook County and Illinois Jury Reporter.[17] R. 67–1; R. 69. The majority of them were settlements. The cases all involved a still-born baby or a baby who died shortly after birth in a medical malpractice case. The compensation awards in the cases ranged from $250,000 to $2,900,000, with the average award for loss of society in *all* the cases being approximately $1,111,000.[18] R. 67–1; R. 69. Johnson contends that the average for all the cases is a "low benchmark" because juries were not given a jury instruction prior to May 31, 2007, indicating that the awards could include compensation for grief, sorrow, and mental suffering of the next of kin. *See* Illinois Pattern Jury Instructions, Civil, No. 31.03(a) (as revised Oct. 2007); Illinois P.A. 95–3, effective May 31, 2007. The six cases Johnson provided that had a jury verdict are as follows:

---

17. Johnson supplemented her original thirty-case filing with a verdict reported in the Chicago Daily Law Bulletin on June 9, 2014. R. 69.

18. Johnson originally provided the Court with other average amounts, but the Court updated these amounts in light of the additional case provided.

**Award** **Case Name**

- $2,900,000: *Lockhart, et al. v. ASAP Perinatal Nursing Staff Solutions, et al.,* Cook County, IL, No. 08 L 2191

- $2,250,000: *Novak v. Advocate Health,* Cook County, IL, No. 08 L 11870

- $1,651,166: *Sanchez v. Womancare S.C.,* Cook County, IL, No. 04 L 5807

- $1,800,000: *Mack v. Bunn, MD, et al.,* Cook County, IL, No. 02 L 5438

- $2,750,000: *Pendleton v. Baumgart, MD,* DeKalb County, IL, No. 05 L 47

- $450,000: *Valdovinos v. Sauer, M.D.,* 2006 WL 4591458, Will County, IL, Case No. 02 L 202

R. 67–1. The average compensation award for loss of society in these cases is approximately $1,740,000. The average verdict for a loss of society in the six cases that Johnson refers to (including the *Valdovinos* case to which both parties refer, R. 67–1 at 21; R. 68 ¶ 223) and the other Illinois case that the Defense points to (the *Thigpen* case, R. 68 ¶ 222) is approximately $1,540,000. The *Harris* case is not included in these averages for reasons discussed below.

 The Court has carefully considered all of the cases provided by the parties, including both those involving a settlement and a jury verdict. Not all of the information provided for certain cases allows the Court to make a complete comparison of the facts in those cases to the facts in this case. Most of the cases do not provide the number of relatives receiving compensation, the allocation of the award, or the relationship between the next of kin and the deceased baby. Others do not provide a full description of the pregnancy, discuss whether the mother was a high-risk patient or susceptible to known-pregnancy complications, or present other relevant facts that might have affected liability or the verdict or settlement amount. Nevertheless, the cases are generally comparable on the whole, and certain overall principles can be gleaned from the cases because they all involve a stillborn baby or baby that died shortly after birth.

Initially, the Court finds the cases with jury verdicts to be more helpful because settlements may be the result of many factors unrelated to actual damages. Also, the Court does not give much (if any) weight to the *Harris* case because plaintiffs in the *Harris* case "sought damages for wrongful death, medical, funeral and burial expenses[,] and loss of consortium," *Harris,* 2010 WL 4020549, which includes categories of actual damages that are not at issue here. It is also an Indiana case, arising under Indiana law, which distinguishes it from the Illinois cases for various reasons—e.g., Indiana law limits the amount for which a medical provider may be liable to $250,000. *See* Ind.Code Ann. § 34–18–14–3. Furthermore, two of the cases with the overall highest awards involved compensation specifically apportioned for the mother's injuries, which also are not at issue here. Those cases are *Mack v. Bunn, MD, et al.,* Cook County, IL, No. 02 L 5438 (R. 67–1 at 13) ($1,800,-000 total verdict, including $1,250,000 for the wrongful death and $550,000 to the mother for her personal injuries); and *Hashmi v. Swedish Covenant Hospital,* Cook County, IL, No. 00 L 13251 (R. 67 ¶ 87(h); 67–1 at 31) ($4,000,000 total settlement including $2,600,000 for the fetal death and $1,400,000 for the mother's per-

sonal injuries). The amount attributed to the baby's death is separated out in those two awards. However, the fact the mother sought compensation for her own personal injuries, those unrelated to the loss of society, may have affected the overall size of those awards. This complicating factor may have also been present in some of the other comparable cases, but the scarce description of certain awards makes it impossible to know.

Overall, the cases with the highest verdict awards demonstrate egregious conduct on the part of the defendant(s) that is somewhat akin to what occurred here. They include *Lockhart, et al. v. ASAP Perinatal Nursing Staff Solutions, et al.,* Cook County, IL, No. 08 L 2191 (R. 69) ($2,900,000 verdict where the mother's condition deteriorated over eight hours while at the hospital and more than three hours passed between documented reports to doctors); *Novak v. Advocate Health,* Cook County, IL, No. 08 L 11870 (R. 67–1 at 4) ($2,250,000 verdict where mother complained of severe pain at the hospital, but the nurse did not report that to the doctor for three hours; attending doctor later examined the mother, but did not order certain tests and instead left hospital, requiring another doctor to perform the C-section); *Pendleton v. Baumgart, MD,* DeKalb County, IL, No. 05 L 47 (R. 67–1 at 11) ($2,750,000 verdict where mother presented to the doctor with signs of a premature rupture of membranes, and the medical records indicated that the doctor did not perform *any* diagnostic testing—doctor argued that he performed a test but forgot to write it in the chart). The cases with high settlement amounts generally involved a mother who was closer to delivering a full-term baby, as was the case with Johnson who was 38 weeks' pregnant when she was induced. Those cases include *Sawatski v. SSM Regional Health Servs., d/b/a St. Francis Hosp. &*

*Health Cntr.,* Cook County, IL Case No. 08 L 10157 (R. 67–1 at 2) ($1,900,000 settlement with mother who delivered stillborn baby at 41 weeks' gestation); and *Starkeshia v. Silver Cross Hospital,* Will County, IL Case No. 07 L 294 (R. 67–1 at 13) ($2,000,000 settlement with mother who was 39 weeks' pregnant at the time of the defendants' alleged negligent conduct). Nevertheless, a higher award will not always coincide with a later delivery, as illustrated in *Valdovinos v. Sauer, M.D.,* 2006 WL 4591458, Will County, IL Case No. 02 L 202 (R. 67–1 at 21) ($450,000 verdict with stillborn baby at 39 weeks' gestation). On the other hand, certain cases with lower compensation awards involved a mother who delivered the child a number of weeks early. They include *Confidential Case Name & Number,* McLean County, IL, (R. 67–1 at 6) ($585,000 settlement where mother who was 32–weeks pregnant at the time defendants failed to properly monitor the fetus); and *Vega v. Silver Cross Hosp. Med. Cntr.,* Cook County, IL Case No. 04 L 11597 (R. 67–1 at 10) ($300,000 settlement where baby was prematurely born at 22 weeks' gestation). This distinction arises from the fact that a family will likely have a greater connection to the baby, as well as a higher expectation of a normal pregnancy and healthy baby, as the mother approaches 40 weeks.

Comparing this particular information to the facts here, in addition to the general compensation amounts in each case, the Court finds that a compensation award comparable to the average of the Illinois verdict awards (and to a lesser extent, the settlement awards) is appropriate. The facts of all those cases each have some similarities to this case. Again, they all involve a seemingly-preventable death of a baby—either a stillborn or a baby that was born alive but passed away a short time

later. Conversely, they also can be distinguished on various grounds. For example, some of the higher-award cases may have allocated an equal amount of compensation to the mother and the father, whereas here, Johnson is entitled to a significantly higher award than Burress (as discussed below). The overall award here in comparison to the cases with the higher damage awards will therefore be less. Nevertheless, taking that fact into consideration, a higher award is still necessary here (i.e., one closer to the average amount as opposed to the median) because (1) Nakia was a full-size, healthy baby when Johnson went to the hospital to be induced; (2) Dr. Javate's negligence is readily apparent; and (3) the consequence of Dr. Javate's conduct easily could have been avoided. Because of this, coupled with the complexity of this case and the other medical malpractice cases presented to the Court, there is not a group of cases—either at the high end or the low end of the range—that dictates a certain compensation award in this case. Rather, it is the spectrum as a whole that is applicable. Therefore, the middle ground of the cases is where the compensation award in this case should fall.

### B. Individual Awards

The Court turns to the particular facts relating to each of Nakia's next of kin and the amount of compensation that each individual should receive.

#### 1. Jocelyn Johnson

Johnson is a caring mother and obviously has a close relationship with her three children that she is raising—her daughter TaKayla and sons Reginald and Jakobee, Tr. 653–55—and there is no reason to believe that a relationship with Nakia would be any less close or loving. By all accounts, TaKayla is a well-educated, articulate, intelligent, and highly-motivated young woman. Tr. 494, 501, 654. The fact that Johnson was able to raise a daughter to be in that position, despite some adversity along the way, is strong evidence that Johnson would have raised Nakia in the same manner. Furthermore, Johnson referred to herself as a "supermom," in that she attends all of her children's basketball, football, volleyball, and soccer games. Tr. 653. She testified that her family is her "everything" and that she wanted Nakia "to grow up to be a very respectful young lady, goal oriented." Tr. 655. As a result of Nakia's death, Johnson was unable to return to work for eight months, Tr. 650, and essentially stayed in bed during that time period, Tr. 678. It affected her relationship with doctors, her family, and Burress. Tr. 651. She did not "trust anybody else" after Nakia's death. Tr. 651. She did not want to participate in events with her family, and she felt as if her "mind was someone else's." Tr. 651. Nakia would have been her only child with Burress. Tr. 680.

Johnson continues to think about Nakia "all the time" and celebrates Nakia's birthday every year with a ritual of going to the cemetery, saying a prayer, and singing happy birthday. Tr. 652–53. Johnson suffered the tragic loss of her daughter, and her life will not be the same without Nakia and the joy and happiness she would have received raising her daughter. Tr. 655. The Court finds Johnson's testimony entirely credible and does not in any way doubt the genuineness of her grief and sorrow. Accordingly, Johnson is entitled to compensation in the amount of $750,000.

#### 2. Christopher Burress

Burress was in a relationship with Johnson from 2007 to 2010. Tr. 661. He testified that they picked out a pink crib when they learned Johnson was having a girl and painted butterflies on the wall in what would have been Nakia's room. Tr. 663.

He testified that it was "hurtful" to hold Nakia after her death and that he tried to "hide the balloons" and the other congratulatory things that were at their house before Johnson arrived home from the hospital. Tr. 675–76. Burress further testified that he was devastated in the days following Nakia's death and that he felt like he "let [Johnson] down." Tr. 678. He also testified that he wanted a "fun" relationship with Nakia that involved activities like those he enjoyed doing with his other children, including fishing, skating, bowling and shopping at the mall. Tr. 680.

The Court finds that Burress has not suffered the same amount of loss that Johnson suffered. The Court does not doubt the genuineness of Burress's grief and sorrow resulting from Nakia's death. Nevertheless, Burress's testimony is not as compelling as that of Johnson. Obviously, Burress is not the mother, and he did not carry Nakia to term. Burress and Johnson also broke up after Nakia's death. It is thus entirely speculative that Burress would have stayed with Johnson had Nakia lived or that Burress would have served as a parent and suffered the same loss of society from that child. This finding is bolstered by the fact that Burress lives in New York while his three other children (who are not related to Johnson)—Lisa, Christopher, and Tyler—live in the Chicagoland area, even though he testified to having a close relationship with them and that he enjoys doing activities with them. Tr. 661, 679–80.

Physical distance between a parent and child does not necessarily indicate the level of closeness. Often times, life circumstances may dictate a certain living arrangement. But here, Burress testified that his three children live with their mother, Tr. 685, and that he does not see his children often because *he* moved, Tr. 660, 679. No testimony was provided demonstrating that: (1) Burress was forced to move away from his children because of something such as an educational opportunity or a job transfer, or (2) it was in any way necessary for him to move. Rather, Burress testified that his "girlfriend got a job in New York" and "it was just *convenient* for [him] to go." Tr. 660 (emphasis added). There also was no evidence presented that Burress compensates for the fact he lives out of state by using something like Skype or "FaceTime" to actually see his children on a regular basis. The sole fact Burress planned to see his kids the weekend following the trial, Tr. 679, does not on its own demonstrate that Burress has the same relationship with his children as Johnson has with her children. It also does not show that Burress would have had the same relationship with Nakia. Accordingly, Burress is entitled to compensation in the amount of $300,000.

### 3. Johnson's Children—TaKayla, Reginald, and Jakobee

TaKayla testified that she was excited when she found out Johnson was having a girl. Tr. 495. She helped Johnson and Burress pick out Nakia's name and decorate Nakia's room. Tr. 495. TaKayla testified that after Nakia's death, she cried a lot but tried to "stay strong for [Johnson]" and "help [her] more than anything." Tr. 500. She further testified that she was looking forward to having a sister who would look up to her in the way that she looked up to her mother. Tr. 502–03.

The Court finds credible TaKayla's testimony that she would have had a close relationship with her sister and that she has also suffered a significant loss of society by not having the benefit of a younger sister to bond with and grow up with. She is entitled to compensation in the amount of $150,000. Furthermore, there is no reason to doubt that Johnson's other two chil-

dren (TaKayla's siblings), Reginald and Jakobee, who appeared in Court but did not testify, have suffered the same loss of society that their sister TaKayla has suffered. The loss may even be more significant given the fact that they are closer in age to Nakia than their older sister TaKayla. Tr. 505. Reginald and Jakobee are *each* entitled to compensation in the amount of $150,000.

#### 4. Burress's Children—Lisa, Christopher, and Tyler

Limited testimony was provided regarding Burress's three children, Lisa, Christopher, and Tyler. Tr. 661, 685. The Court finds that Burress's three children, who had infrequent contact with Johnson and her children even prior to the time Burress and Johnson separated, are not entitled to any compensation. There is not credible evidence that meets the burden of proof that they would have suffered any loss of society based on Nakia's death. In fact, there is no indication that they were even aware of the fact Johnson was pregnant. Without evidence on that point, the Court finds the burden of proof has not been met to justify an award of compensation to Burress's three children.

To summarize, Nakia's next of kin are entitled to the following compensation amounts:

| | |
|---|---|
| Jocelyn Johnson: | $750,000 |
| Christopher Burress: | $300,000 |
| TaKayla Toles: | $150,000 |
| Reginald Walton, Jr.: | $150,000 |
| Jakobee Walton: | $150,000 |
| Christopher Burress, Jr.: | $ 0.00 |
| Lisa Burress: | $ 0.00 |
| Tyler French: | $ 0.00 |
| **Total**: | $1,500,000 |

The $1,500,000 amount is similar to the approximate average for all the cases involving a jury verdict—$1,540,000. Yet, it is somewhat higher than the approximate average for *all* the cases—$1,111,000. This makes sense given that settlements may be lower, thereby bringing down the overall average, because of the costs and risks of going to trial. The Court notes Johnson's counsel's argument that the addition of Illinois Pattern Jury Instruction No. 31.03(a) after May 31, 2007, which instructs juries that the compensation award can include grief, sorrow, and mental suffering, may render the overall average for the past ten years low. However, there is no concrete method of accounting for the difference because some might consider grief, sorrow, and mental suffering under the overall umbrella of "loss of society." Accordingly, the $1,500,000 amount is appropriate based on the particular facts of this case and in comparison to other similar cases.

#### C. Set–Off

Prior to trial, Johnson settled with former defendants Lori Schwartz, R.N., and Schwartz's employer, Sisters of St. Francis Health Services, Inc., for $650,000. R. 72 ¶ 1. The parties agree that the Court should set-off the $650,000 settlement from the total compensation award, which is $1,500,000. R. 72 ¶ 5. The Court agrees that this is proper. *See Arroyo*, 2010 WL 1437925, at *17 (citing *Sompo Japan Ins., Inc. v. Nippon Cargo Airlines Co., Ltd.*, 522 F.3d 776, 789 (7th Cir.2008)).

#### CONCLUSION

For the foregoing reasons, the Court finds that Dr. Javate's negligence was a

proximate cause of Nakia's death. As a result of the set-off, judgment is entered against the United States in the amount of $850,000.